(729 P.2d 1245)

No. 56,940

STATE OF KANSAS, *Appellee*, v. ELMO DEAN DRESSEL, SAM MCHUGH WEBB, and ROBERT WILLIS STRICKLAND, JR., *Appellants*.

Opinion filed December 18, 1986.

*Charles A. O'Hara*, of O'Hara, O'Hara & Tousley, of Wichita, for appellant Dressel.

*Daniel H. Phillips*, of Lyon & Phillips, of Wichita, for appellant Webb.

*Roger L. Falk*, of Matlack & Foote, P.A., of Wichita, for appellant Strickland.

*Neal B. Brady* and *Debra Barnett*, assistant district attorneys, *Clark V. Owens*, district attorney, and *Robert T. Stephan*, attorney general, for the appellee.

Before PARKS, P.J., PAUL E. MILLER, District Judge, assigned, and BILL D. ROBINSON, JR., Associate District Judge, assigned.

ROBINSON, J.: The defendants, Elmo Dean Dressel, Sam McHugh Webb, and Robert Willis Strickland, Jr., appeal their convictions of one count of attempted felony theft (K.S.A. 21-3301 and K.S.A. 21-3701) and six counts of felony theft (K.S.A. 21-3701) following a nine-week jury trial.

Cargill, Incorporated (Cargill) is an agribusiness conglomerate with principal offices in Minneapolis, Minnesota. Cargill

operates a soybean receiving and processing plant in Wichita, Kansas. The first step in this business is that of acquiring soybeans for processing. These beans are delivered to the plant by trucks.

The delivering truck pulls onto a scale called a gross weight scale and the scale operator pushes a button which weighs and then stores the truck's gross weight in a computer's memory. This computer is capable of storing two gross weights at the same time. The truck then drives to the unload or pit area where the soybeans are dumped and elevated into storage for future use. At the same time, a sample is taken for grading purposes.

The delivering truck, now empty, proceeds to another scale, the tare scale. The scale operator pushes the tare weight button, which causes an "in-truck scale ticket" to be printed. This ticket has printed on it the truck's gross weight and its tare weight, as well as the time and date of the tare reading. Also printed is the automatically calculated net weight of the delivery transaction. This scale ticket is used as the receipt evidencing the delivery of the beans and represents an obligation of payment on the part of Cargill.

As the scale ticket printer prints the in-truck scale ticket, it simultaneously records the identical information on a "continual roll tape." This produces a daily cumulative record of all transactions on the scales reflecting the weights and times the tare weights were recorded.

The scale operation is capable of handling two trucks within the stages of unloading. While one truck is at the unloading pit, a second truck can be on the gross scale. When there are two gross weights in the memory, it is the first one that is to be recorded when the tare weight button is pushed. The scale ticket printer will print a given tare weight as often as the operator engages the printer mechanism and a gross weight is available in memory to produce a new weight computation. The recording and printing of the various weights in the proper sequence is necessary to produce true results and this function is under the total control of the scale operator.

As a security precaution, both the gross and tare scales are monitored by two closed-circuit video cameras. One camera tapes the view of the gross scale and the other of the tare scale with a distant view of the unload pit. Their signals are fed to two

video monitors and two time-lapse video recorders. The recorders also reflect a time and date for each frame recorded.

In late April and early May 1983, David Larson, an accountant at the Wichita facility, had an opportunity to view several of these videotapes. Since he observed some unusual activity, several Cargill employees from Minneapolis came to Wichita on May 10 to view the tapes.

Review of the tapes, in conjunction with an analysis of unloading documents, disclosed several discrepancies in the unloads made by a particular F & M Grain Company (F & M) truck between April 25, 1983, and May 12, 1983. First, the F & M truck consistently veered sharply to the right as it came out of the unload shed onto the tare scale. Second, the tare weight of the F & M truck was "punched in" within one to two minutes of when the previous truck received its tare weight. Third, the tare weight of the F & M truck was consistently similar to the tare weight of the truck immediately preceding it. Fourth, the driver of the F & M truck did not get out of his vehicle while it was stopped on the tare scale. Fifth, the F & M truck, which was supposedly coming from Commerce City, Colorado, made frequent unloads at the plant, often two unloads per day. Sixth, the license tag on the F & M truck varied, depending on whether the truck was making a morning or afternoon unload. Finally, the tarp on the F & M truck did not move while the truck was in the unloading pit.

On May 12, 1983, several Cargill employees set up surveillance to watch the F & M truck. David Larson observed that the truck, driven by defendant Sam McHugh Webb, was improperly positioned over the unload pit and that the truck moved slowly onto the tare scale. In addition, Larson noted that after the truck cleared the area, it was traveling in low gear emitting black smoke and "hugged" the road. Larson concluded that the F & M truck had not unloaded any soybeans.

Ted F. Neises, Jr., who was near the F & M truck, also concluded that the truck had not made a delivery since he did not see or hear any soybeans being unloaded. Defendant Robert Willis Strickland, Jr., was the Cargill scale operator at the time of this delivery.

On May 13, 1983, Cargill employees contacted the Kansas Bureau of Investigation. Several special agents, assisted by Car-

gill employees, conducted an investigation concerning the activities of the F & M truck. On May 17, 1983, David Larson and KBI special agent Ed Bartkoski observed the F & M truck parked in the parking lot of a west Wichita motel. Later that day, they saw Webb and the third defendant, Elmo Dean Dressel, leave the motel in a brown pickup truck. Webb drove the pickup to the Cargill plant and circled the parking lot twice. Strickland was not working the scales on this date.

On May 18, 1983, Larson and Bartkoski observed the F & M truck, driven by Webb, make a bona fide unload. While making this unload, the truck was in the unload pit for approximately two minutes. Following the delivery, Webb returned to the motel where he was met by Dressel. They had been staying in the same motel room. Subsequent testing by the state grain inspection department revealed that the soybeans delivered were sour, a condition created by damp storage and the lack of proper air circulation. The videotape of this transaction was recorded over on June 6, 1983. This tape was never in the possession of the KBI and it was the policy of Cargill to keep the tapes for 90 days.

On April 26, 28, 29, and May 2, 3, and 4, 1983, Cargill issued checks to F & M for soybeans allegedly delivered on those dates. Each check was in excess of $100. The checks, which were subsequently cashed, were mailed to 6900 E. 53rd Place, Commerce City, Colorado, a warehouse leased by Dressel. Checks were also issued for the May 11 and 12, 1983, "deliveries"; however, payment was stopped on these two checks.

On May 26, 1983, Dressel, Webb, and Strickland were charged with eleven counts of theft by deception. According to the complaint, the defendants deceptively obtained control over money belonging to Cargill on April 26, 28, 29, and May 2, 3, 4, 5, 6, 11, and 12, 1983. Ultimately, the defendants were tried for attempted theft in connection with the May 12 transaction and theft by deception in connection with the transactions of April 26, 28, 29, and May 2, 3, 4, and 11, 1983.

On October 28, 1983, James Z. Hernandez entered his appearance as special counsel to assist the district attorney in prosecuting the case against the defendants. Mr. Hernandez was hired by Cargill.

On January 19, 1984, the defendants were found guilty of one count of attempted felony theft and seven counts of felony theft;

however, the defendants' post-trial motion for judgment of acquittal concerning count two, the May 11, 1983, transaction, was sustained.

Additional facts are included in the discussion of defendants' alleged errors.

Defendants' first contention is that the trial court erred in refusing the defendants' request for discovery and request for sanctions against the prosecution based upon the premise that the trial court could not compel the complaining witness, Cargill, to disclose information. The defendants are primarily concerned with three items they attempted to discover prior to trial. These were Cargill's inventory, tests as to how fast a truck could unload, and tests on the synchronization of the three clocks on the gross scale, tare scale, and continuous roll tape.

The majority of the investigation into the charges against the defendants was performed by Cargill and not by the State of Kansas. As a result, most of the evidence was, at one time or another, in the control of Cargill and not the State of Kansas. Motions for discovery of these items of evidence were consistently denied by the trial judge, who ruled that he was without jurisdiction to order Cargill to participate in discovery.

As part of this first issue, defendants contend that the attorney hired by Cargill to assist in the prosecution was, in fact, a "prosecuting attorney" who should have been required to participate in discovery pursuant to K.S.A. 22-3212.

The State, relying on *State v. Berg*, 236 Kan. 562, 694 P.2d 427 (1985), and *State ex rel. Rome v. Fountain*, 234 Kan. 943, 678 P.2d 146 (1984), contends that Cargill's attorney was only an "associate attorney" and, therefore, not subject to K.S.A. 22-3212 and that he was merely hired to "assist" the prosecution and was not a "prosecuting attorney" as set out in the statute.

K.S.A. 22-3212 provides in part:

"(1) Upon request, *the prosecuting attorney* shall permit the defendant to inspect and copy or photograph any relevant . . . (b) results or reports of . . . scientific tests or experiments made in connection with the particular case, or copies thereof, the existence of which is known, or by *the exercise of due diligence may become known, to the prosecuting attorney* . . . .

"(2) *Upon request,* the prosecuting attorney *shall permit the defendant to inspect and copy or photograph books, papers, documents, tangible objects, . . . or portions thereof,* which are or have been within the possession, custody or control of the prosecution, *and which are material to the case and will not place an unreasonable burden upon the prosecution. Except as provided in*

*subsections (1)(b) and (1)(d), this section does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by officers in connection with the investigation or prosecution of the case."* (Emphasis added.)

The term "prosecuting attorney" is defined in K.S.A. 1985 Supp. 22-2202(17):

" 'Prosecuting attorney' means any attorney who is authorized by law to appear for and on behalf of the state of Kansas in a criminal case, and includes the attorney general, an assistant attorney general, the county or district attorney, an assistant county or district attorney and any special prosecutor whose appearance is approved by the court."

The attorney hired by Cargill was allowed to assist in the prosecution pursuant to K.S.A. 19-717.

"[T]he prosecuting witness in any criminal action or proceeding may, at his own expense, employ an attorney or attorneys *to assist the county attorney to perform his duties in any criminal action or proceeding under any of the laws of the state of Kansas*, and *such attorney or attorneys shall be recognized by the county attorney and court as associate counsel* in such action or proceeding, and no prosecution shall be dismissed over the objection of such associate counsel until the reason of the county attorney for such dismissal, together with the objections thereto of such associate counsel, shall have been filed in writing, argued by counsel, and fully considered by the court." (Emphasis added.)

Clearly, the attorney hired by Cargill was not a "prosecuting attorney" as defined in K.S.A. 1985 Supp. 22-2202(17) above, nor was he a "special prosecutor." In *Berg*, 236 Kan. at 567, the court held that the term "special prosecutor" means "one who is temporarily appointed by the court to replace the absent county attorney." He can be labeled only as an "associate counsel," employed to "assist" the prosecuting attorney. It is also clear that an "associate counsel" does not have control over the case. The law in Kansas is " 'a criminal prosecution is a state affair and the control of it is in the public prosecutor.' " *Berg*, 236 Kan. at 565.

The Kansas cases relating to these terms and their respective definitions concerned questions of who had control over the case. None of the cases dealt with the question raised in this case. Is the "associate counsel" required to comply with the discovery requirements of our criminal procedure?

The complaining witness is not required to employ private counsel to assist the district attorney. This is a statutory privilege and with it should go certain responsibilities. Cargill's attorney had knowledge and control over the items requested or, at the very least, had the ability to become knowledgeable of them.

The State cannot violate the constitutional right of a defendant to discover evidence that is favorable or material to his guilt or innocence on the mere assertion that the district attorney has no control over an attorney who is assisting him. Cargill did not hire the attorney to represent them, they hired an "associate counsel" to assist the district attorney. Fundamental fairness requires the associate counsel allowed under K.S.A. 19-717 to be bound by the discovery requirements of our criminal procedure. To rule otherwise would allow a complaining witness to have ultimate control over the case.

It follows that had the trial court ordered discovery, it also had the authority to enforce its order. A trial court has the authority to enforce its discovery orders and sanctions are sometimes necessary to compel compliance. The least drastic sanctions which will accomplish the objectives should be employed. *State v. Schilling*, 238 Kan. 593, Syl. ¶ 4, 712 P.2d 1233 (1986).

Having ruled that the trial court erred in holding that it was without jurisdiction to compel Cargill's attorney to participate in discovery, we must consider if it is reversible error.

The test for determining whether a conviction should be reversed is stated in *United States V. Bagley*, 473 U.S. 667, 87 L. Ed. 2d 481, 105 S. Ct. 3375 (1985):

"Consistent with 'our overriding concern with the justice of the finding of guilt,' *United States v. Agurs*, 427 U.S., at 112, a constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." 473 U.S. at 678.

The court went on to state,

"The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." 473 U.S. at 682.

As stated earlier, the defendants were primarily concerned with discovering three items or areas of the investigation.

1. Cargill's Inventory. On November 18, 1983, the defendants filed a motion to discover Cargill's inventory. On November 30, 1983, the motion was denied. The defendants subsequently made other motions to obtain the inventory; however, the motions were consistently denied by the trial judge who ruled that he was without jurisdiction to order Cargill to participate in discovery. The judge did, however, state that he would force

compliance with a subpoena duces tecum if the defendants issued a subpoena and Cargill refused to comply with the same.

During trial, defense counsel informed the court that they had subpoenaed Cargill's inventory. Apparently, the defendants were supplied with an incomplete inventory which indicated the loss for the elevator area only rather than the loss for the entire facility. A hearing was conducted outside the presence of the jury, where David Larson testified that a "measured inventory" concerning the period between March 1 and May 31, 1983, indicated that Cargill had lost 99,000 bushels of soybeans. He also testified that the August 10, 1983,inventory which the defendants wanted would show that Cargill had lost more than 99,000 bushels of soybeans between August 1982 and August 1983.

Defense counsel wanted Cargill's inventory for two reasons. First, according to the defendants, an inventory would either confirm or deny allegations that Cargill had suffered a loss as a result of the defendants' failure to deliver soybeans. Second, the defendants wanted the inventory because the trial court had ruled that the defendants were prohibited from introducing evidence that other individuals had been charged in a second criminal case with the crime of theft by deception until the defendants proved to the court that the other crimes occurred about the same time as the crimes in this case and that the total amount of the grain not delivered to Cargill was reasonably close to the amount of the grain not delivered by the other individuals.

2. Tests Concerning How Fast a Truck Could Be Unloaded. On June 2, 1983, Cargill employees conducted a number of tests using the F & M truck. The tests consisted of: (a) determining how many weights could be stored in the memory of the gross scale computer; (b) determining how many tare weights could be obtained by driving a truck across the tare scale without stopping; (c) ascertaining what effect veering sharply to the right while approaching the tare scales would have on the recorded tare weight; (d) determining whether a tare weight could be obtained if a truck were only partially on the tare scale; (e) ascertaining in what position a truck would have to be in order to make a delivery into the unloading pit; (f) determining whether a truck had to come to a complete stop before its gross weight could be entered; (g) ascertaining how much the gross weight of

a vehicle could fluctuate; (h) determining how the true weight of a truck could be altered by use of a "key switch"; (i) comparing the time on the wall clock in the scale house with the time printed on the continuous roll tape and the time reflected on the videotapes; and (j) determining whether the same truck could register varying gross and tare weights.

Prior to trial, the State provided to defendants a document titled "Results of Tests Conducted June 2, 1983 by Cargill Employees." These results were highly summarized and in and of themselves not self-explanatory. Although no results as to unloading times were given, it is apparent that such tests were conducted to some extent. Two of the State's witnesses testified that the F & M truck in question could be unloaded in two minutes, contrary to statements made by Ed Bartkoski in the affidavits for arrest warrants. In addition, one of the State's witnesses did testify that Cargill employees had conducted a series of tests to determine how long it took 900 bushels of soybeans to travel through the pit area into the sampler machine. The State knew about the test results prior to trial yet failed to disclose the test results to defense counsel.

3. Tests Concerning the Synchronization of the Clocks on the Gross Scale, Tare Scale, and Continuous Roll Tape. At trial, one of the State's witnesses testified that the only "recorded" test results concerning the synchronization of the clocks was contained in the document which had been given to defense counsel by the State. However, that report said only that "Time clocks on the two video time-lapse machines not synchronized and neither synchronized with continued tape clock." In a hearing outside the presence of the jury, David Larson testified that he recalled the tests indicating that the gross and tare clocks were off by approximately thirty seconds and that the tare clock and the continuous roll tape clock were off by about a minute to a minute-and-a-half.

As previously noted, the videotape of May 18, 1983, was recorded over by Cargill. This was the only tape that showed a bona fide unload in two minutes. It was also the events on this tape that the KBI, as well as the employees of Cargill, were watching. The only available tape of a bona fide unload was that of May 4, 1983; however, that unload took three minutes instead of two minutes.

We find that these requested items are material since there is a reasonable probability that, had they been disclosed to the defendants, the result of the trial would have been different. Such information was of vital importance and absent some good reason not shown here, justice required that it be given to the defendants. Defendants made specific and relevant requests of the prosecution (including the "associate counsel") and the failure to make any response is seldom, if ever, excusable. See *United States v. Agurs*, 427 U.S. 97, 49 L. Ed. 2d 342, 96 S. Ct. 2392 (1976).

The judgment of the trial court is reversed and the case is remanded for a new trial with instructions to afford to the defendants their right of pretrial discovery in accordance with the views set forth in this opinion.