No. 56,940

STATE OF KANSAS, *Appellee*, v. ELMO DEAN DRESSEL, SAM MCHUGH WEBB, and ROBERT WILLIS STRICKLAND, JR., *Appellants.*

(738 P.2d 830)

Opinion filed June 12, 1987.

*Charles A. O'Hara*, of O'Hara, O'Hara & Tousley, of Wichita, argued the cause and was on the brief for the appellant Elmo D. Dressel.

*Daniel H. Phillips*, of Lyon & Phillips, of Wichita argued the cause and was on the brief for the appellant Sam McHugh Webb.

*Roger L. Falk*, Matlack & Foote, P.A., of Wichita, argued the cause and was on the brief for the appellant Robert Willis Strickland, Jr.

*Geary N. Gorup*, assistant district attorney, argued the cause, and *Robert T. Stephan*, attorney general, *Clark V. Owens*, district attorney, and *Neal B. Brady*

and *Debra Barnett,* assistant district attorneys, were on the briefs for the appellee.

The opinion of the court was delivered by

MILLER, J.: The defendants, Elmo Dean Dressel, Sam McHugh Webb, and Robert Willis Strickland, Jr., were each convicted of one count of attempted felony theft, K.S.A. 21-3301 and K.S.A. 21-3701, and six counts of felony theft, K.S.A. 21-3701, following a nine-week jury trial. They appealed, and the Court of Appeals reversed the convictions. *State v. Dressel,* 11 Kan. App. 2d 552, 729 P.2d 1245 (1986). We granted the State's petition for review on February 27, 1987.

The charges arose from activities at Cargill's soybean receiving and processing plant in Wichita, Kansas. Webb, a truck driver, purported to deliver and unload soybeans at that plant. Payment for the soybeans was made by check, mailed to Webb's employer, the F & M Grain Company of Commerce City, Colorado. Dressel was a part owner of F & M and active in its operation. Defendant Strickland was employed by Cargill at the Wichita facility. His job was to weigh delivery trucks before and after unloading, a process which produces the measurements from which net delivery weight and payment are calculated. The State contended that Webb did not unload his cargo; Strickland managed to manipulate the scales to show large deliveries which were not made; and Cargill was thus defrauded when it paid for soybeans it did not receive.

All of the defendants challenge the sufficiency of the evidence to support the convictions. The standard of review on appeal is whether the evidence, viewed in the light most favorable to the prosecution, convinces the appellate court that a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. The appellate court looks only to the evidence in favor of the verdict to determine if the essential elements of a charge are sustained. *State v. Bird,* 240 Kan. 288, 298-99, 729 P.2d 1136 (1986).

We have carefully reviewed the record and find the statement of the facts, as contained in the opinion of the Court of Appeals, is correct. We quote from that opinion:

"Cargill, Incorporated (Cargill) is an agribusiness conglomerate with principal

offices in Minneapolis, Minnesota. Cargill operates a soybean receiving and processing plant in Wichita, Kansas. The first step in this business is that of acquiring soybeans for processing. These beans are delivered to the plant by trucks.

"The delivering truck pulls onto a scale called a gross weight scale and the scale operator pushes a button which weighs and then stores the truck's gross weight in a computer's memory. This computer is capable of storing two gross weights at the same time. The truck then drives to the unload or pit area where the soybeans are dumped and elevated into storage for future use. At the same time, a sample is taken for grading purposes.

"The delivering truck, now empty, proceeds to another scale, the tare scale. The scale operator pushes the tare weight button, which causes an 'in-truck scale ticket' to be printed. This ticket has printed on it the truck's gross weight and its tare weight, as well as the time and date of the tare reading. Also printed is the automatically calculated net weight of the delivery transaction. This scale ticket is used as the receipt evidencing the delivery of the beans and represents an obligation of payment on the part of Cargill.

"As the scale ticket printer prints the in-truck scale ticket, it simultaneously records the identical information on a 'continual roll tape.' This produces a daily cumulative record of all transactions on the scales reflecting the weights and times the tare weights were recorded.

"The scale operation is capable of handling two trucks within the stages of unloading. While one truck is at the unloading pit, a second truck can be on the gross scale. When there are two gross weights in the memory, it is the first one that is to be recorded when the tare weight button is pushed. The scale ticket printer will print a given tare weight as often as the operator engages the printer mechanism and a gross weight is available in memory to produce a new weight computation. The recording and printing of the various weights in the proper sequence is necessary to produce true results and this function is under the total control of the scale operator.

"As a security precaution, both the gross and tare scales are monitored by two closed-circuit video cameras. One camera tapes the view of the gross scale and the other of the tare scale with a distant view of the unload pit. Their signals are fed to two video monitors and two time-lapse video recorders. The recorders also reflect a time and date for each frame recorded.

"In late April and early May 1983, David Larson, an accountant at the Wichita facility, had an opportunity to view several of these videotapes. Since he observed some unusual activity, several Cargill employees from Minneapolis came to Wichita on May 10 to view the tapes.

"Review of the tapes, in conjunction with an analysis of unloading documents, disclosed several discrepancies in the unloads made by a particular F & M Grain Company (F & M) truck between April 25, 1983, and May 12, 1983. First, the F & M truck consistently veered sharply to the right as it came out of the unload shed onto the tare scale. Second, the tare weight of the F & M truck was 'punched in' within one or two minutes of when the previous truck received its tare weight. Third, the tare weight of the F & M truck was consistently similar to the tare

weight of the truck immediately preceding it. Fourth, the driver of the F & M truck did not get out of his vehicle while it was stopped on the tare scale. Fifth, the F & M truck, which was supposedly coming from Commerce City, Colorado, made frequent unloads at the plant, often two unloads per day. Sixth, the license tag on the F & M truck varied, depending on whether the truck was making a morning or afternoon unload. Finally, the tarp on the F & M truck did not move while the truck was in the unloading pit.

"On May 12, 1983, several Cargill employees set up surveillance to watch the F & M truck. David Larson observed that the truck, driven by defendant Sam McHugh Webb, was improperly positioned over the unload pit and that the truck moved slowly onto the tare scale. In addition, Larson noted that after the truck cleared the area, it was traveling in low gear emitting black smoke and 'hugged' the road. Larson concluded that the F & M truck had not unloaded any soybeans.

"Ted F. Neises, Jr., who was near the F & M truck, also concluded that the truck had not made a delivery since he did not see or hear any soybeans being unloaded. Defendant Robert Willis Strickland, Jr., was the Cargill scale operator at the time of this delivery.

"On May 13, 1983, Cargill employees contacted the Kansas Bureau of Investigation. Several special agents, assisted by Cargill employees, conducted an investigation concerning the activities of the F & M truck. On May 17, 1983, David Larson and KBI special agent Ed Bartkoski observed the F & M truck parked in the parking lot of a west Wichita motel. Later that day, they saw Webb and the third defendant, Elmo Dean Dressel, leave the motel in a brown pickup truck. Webb drove the pickup to the Cargill plant and circled the parking lot twice. Strickland was not working the scales on this date.

"On May 18, 1983, Larson and Bartkoski observed the F & M truck, driven by Webb, make a bona fide unload. While making this unload, the truck was in the unload pit for approximately two minutes. Following the delivery, Webb returned to the motel where he was met by Dressel. They had been staying in the same motel room. Subsequent testing by the state grain inspection department revealed that the soybeans delivered were sour, a condition created by damp storage and the lack of proper air circulation. The videotape of this transaction was recorded over on June 6, 1983. This tape was never in the possession of the KBI and it was the policy of Cargill to keep the tapes for 90 days.

"On April 26, 28, 29 and May 2, 3, and 4, 1983, Cargill issued checks to F & M for soybeans allegedly delivered on those dates. Each check was in excess of $100. The checks, which were subsequently cashed, were mailed to 6900 E. 53rd Place, Commerce City, Colorado, a warehouse leased by Dressel. Checks were also issued for the May 11 and 12, 1983, 'deliveries'; however, payment was stopped on these two checks.

"On May 26, 1983, Dressel, Webb, and Strickland were charged with eleven counts of theft by deception. According to the complaint, the defendants deceptively obtained control over money belonging to Cargill on April 26, 28, 29, and May 2, 3, 4, 5, 6, 11, and 12, 1983. Ultimately, the defendants were tried for attempted theft in connection with the May 12 transaction and theft by deception

in connection with the transactions of April 26, 28, 29, and May 2, 3, 4, and 11, 1983.

"On October 28, 1983, James Z. Hernandez entered his appearance as special counsel to assist the district attorney in prosecuting the case against the defendants. Mr. Hernandez was hired by Cargill." 11 Kan. App. 2d at 552-54.

Defendants point out that there was no evidence before the jury regarding the precise number of pounds or bushels of soybeans missing from the Cargill inventory. Even so, "a verdict of guilty in a criminal case will not be disturbed on appeal if there is substantial evidence from which a jury could find guilt beyond a reasonable doubt, even though the evidence is entirely circumstantial." *State v. Bird,* 240 Kan. at 299.

There was direct evidence that all of the allegedly fraudulent F & M "unloads" were made while defendant Strickland was on duty for Cargill at his weight station. Dressel and Webb were seen circling the Cargill facility on a day when Strickland was not on duty; no delivery was made on that date. Webb was driving the truck and Strickland was on duty when each challenged delivery was made. The F & M truck consistently veered to the right as it came onto the tare scale, which allowed the scale operator time to generate a false tare weight. The tare weight of the F & M truck was entered within one or two minutes of the entry of the previous truck's tare weight, or before the proceeding truck left the tare scale, and was consistently similar to the weight of the previous truck. The F & M truck's gross weight, prior to its "unloads," showed little variance from day to day, yet its tare (unloaded) weight varied by thousands of pounds. When the F & M truck was under surveillance, eyewitnesses did not see or hear any soybeans being unloaded. Additionally, and unlike that of other trucks, the tarp on the F & M truck did not move while the truck was being "unloaded." While this evidence is largely circumstantial, it is clear that Cargill paid substantial sums of money to F & M and, given the circumstances surrounding the purported deliveries, it is not unreasonable to infer that no soybeans were actually delivered. As such, there is evidence of a loss by Cargill in the form of money paid to F & M.

Dressel argues that there was insufficient evidence of criminal intent to support his conviction. He was shown to be part owner of F & M; he was seen with Webb in Wichita during the time the offenses were committed; and the payments for the fraudulent

deliveries were sent to an address which Dressel maintained in Colorado. Considering the evidence in the light most favorable to the prosecution, as we are required to do, we hold that there is an abundance of substantial competent evidence to support the jury's verdict and the convictions.

The principal issue on appeal concerns the matter of discovery. Much of the evidence of this case was gathered by Cargill personnel, both before and after the arrest of the defendants. Prior to trial, defense counsel filed a number of motions for discovery and for sanctions for destruction of evidence. On appeal, they are primarily concerned with four items of evidence: Cargill's inventory for the year 1983; results of tests allegedly conducted by Cargill concerning the synchronization of clocks on the gross and tare scales and continuous roll tape; tests conducted by Cargill with an F & M truck; and a tape of the May 18, 1983, bona fide unload which was destroyed later by Cargill employees.

The trial court denied defendants' discovery motions and declined to impose sanctions for destruction of the May 18 tape. The trial court ruled repeatedly that Cargill was not a party to the criminal case; that the trial court had no jurisdiction over it; and that while it could not order a nonparty to produce documents under K.S.A. 22-3212, defendants could subpoena the records and the court would enforce the subpoena. Defendants contend that the trial court erred in ruling that it was without jurisdiction to compel the complaining witness, Cargill, Inc., or the attorney Cargill retained to assist the prosecution, James Hernandez, to participate in discovery, and in failing to impose sanctions for the destruction of the May 18 tape.

The Court of Appeals reversed the trial court and, in ruling upon this issue, said:

"The complaining witness is not required to employ private counsel to assist the district attorney. This is a statutory privilege and with it should go certain responsibilities. Cargill's attorney had knowledge and control over the items requested or, at the very least, had the ability to become knowledgeable of them. The State cannot violate the constitutional right of a defendant to discover evidence that is favorable or material to his guilt or innocence on the mere assertion that the district attorney has no control over an attorney who is assisting him. Cargill did not hire the attorney to represent them, they hired an 'associate counsel' to assist the district attorney. Fundamental fairness requires the asso-

ciate counsel allowed under K.S.A. 19-717 to be bound by the discovery requirements of our criminal procedure. To rule otherwise would allow a complaining witness to have ultimate control over the case." 11 Kan. App. 2d at 557-58.

Under the Court of Appeals' ruling, any corporation which hires an attorney to assist the prosecuting attorney makes all of its corporate files and records discoverable under K.S.A. 22-3212, assuming they are relevant to the issues. If, however, the corporation does not hire an attorney to assist the prosecuting attorney, none of its files or records are subject to discovery under that statute. The ruling by the Court of Appeals would most certainly discourage, if not completely end, the engagement of assistant counsel by the injured party in such cases. We do not find this result desirable.

Moreover, the State did not deprive the defendants of discovery because the State did not have control over the files and records of Cargill. Cargill was not a party to this criminal prosecution, and the trial court did not err in ruling that it had no jurisdiction over Cargill, and no authority to compel discovery from it pursuant to K.S.A. 22-3212.

Failure to impose the discovery mandates of K.S.A. 22-3212 on a complaining witness does not foreclose discovery; it merely forecloses one method of discovery. Criminal defendants have the right to subpoena witnesses and to compel the production of documents. This right is statutorily provided by K.S.A. 22-3214 and was explicitly recognized by this court in *State v. Humphrey*, 217 Kan. 352, 361, 537 P.2d 155 (1975). Further, to adopt the rule announced by the Court of Appeals would place defendants in a different position depending on whether the complaining witness has hired a private attorney to assist the prosecutor. If a private attorney has been hired, all relevant records of the complaining witness would be discoverable under K.S.A. 22-3212; if a private attorney has not been hired, such records would be available only by subpoena *duces tecum*. We see no reason for such a distinction. Finally, we do not believe that failure to make a prosecuting witness, who has hired an attorney to assist the prosecutor, subject to the K.S.A. 22-3212 discovery rule would give the complaining witness "ultimate control over the case," as suggested by the Court of Appeals. The complain-

ing witness would be in exactly the same position as other complaining witnesses—subject to make disclosures in response to subpoena.

We therefore decline to adopt the broad rule announced by the Court of Appeals. We recognize, however, that participation of privately retained counsel in a criminal prosecution creates special problems with regard to criminal defendants' rights to discovery and the fiduciary relationship between the attorney and his or her client. We therefore offer the following guidelines and rules to govern discovery when a complaining witness has hired an attorney to assist in a criminal prosecution.

K.S.A. 22-3212 governs discovery in a criminal trial. It provides in pertinent part:

"(1) Upon request, *the prosecuting attorney* shall permit the defendant to inspect and copy or photograph any relevant (a) written or recorded statements or confessions made by the defendant, or copies thereof, *which are or have been in the possession, custody or control of the prosecution,* the existence of which is known, or by the exercise of due diligence may become known, to the prosecuting attorney; (b) results or reports of . . . scientific tests or experiments made in connection with the particular case, or copies thereof, the existence of which is known, or by the exercise of due diligence may become known, to the prosecuting attorney. . . .

"(2) Upon request, *the prosecuting attorney* shall permit the defendant to inspect and copy or photograph books, papers, documents, tangible objects, buildings or places, or copies, or portions thereof, *which are or have been within the possession, custody or control of the prosecution,* and which are material to the case and will not place an unreasonable burden upon the prosecution." (Emphasis supplied.)

Mr. Hernandez was employed by the prosecuting witness to assist the county attorney pursuant to K.S.A. 19-717. That statute reads:

"That the prosecuting witness in any criminal action or proceeding may, at his own expense, employ an attorney or attorneys to assist the county attorney to perform his duties in any criminal action or proceeding under any of the laws of the state of Kansas, and such attorney or attorneys shall be recognized by the county attorney and court as associate counsel in such action or proceeding, and no prosecution shall be dismissed over the objection of such associate counsel until the reason of the county attorney for such dismissal, together with the objections thereto of such associate counsel, shall have been filed in writing, argued by counsel, and fully considered by the court."

Mr. Hernandez was not a "prosecuting attorney" as defined by

K.S.A. 1986 Supp. 22-2202(17), a "temporary county attorney," as defined in K.S.A. 19-715(b), or a "special prosecutor," one who is temporarily appointed by the court to replace the absent, sick, or disabled county attorney. K.S.A. 19-711. As the Court of Appeals observed, he was merely associate counsel, employed to assist the prosecuting attorney, and did not have control over the case. See *State v. Dressel*, 11 Kan. App. 2d at 557, and *State v. Berg*, 236 Kan. 562, 694 P.2d 427 (1985).

Because an attorney hired pursuant to 19-717 is not a "prosecuting attorney," the requirements of 22-3212 do not explicitly apply. K.S.A. 22-3212 imposes discovery requirements upon the "prosecuting attorney." An attorney hired pursuant to 19-717 is, however, hired to *assist* the prosecution. As such, he or she may not be relieved of all criminal discovery requirements. The criminal defendant's interest in complete discovery, however, must be balanced with the attorney's obligation to his or her client. An attorney is obligated to act in the best interests of his or her client which, in the case of an attorney hired pursuant to 19-717, is the complaining witness who retained the attorney's services. *State v. Berg*, 236 Kan. at 568. We believe the appropriate balance between these interests is to require an assistant attorney hired pursuant to 19-717 to comply with requests under 22-3212 to the extent those requests concern items within the attorney's possession, custody, or control. That is, he or she is not required to facilitate the defendant's acquisition of those items the existence of which is known, or by the exercise of due diligence may become known, to that attorney. This rule will afford some protection to the confidential relationship between attorney and client and some protection to the criminal defendant's right to discovery. This compromise is necessary because of the peculiar role of an attorney who is privately retained by a complaining witness to assist in a criminal prosecution.

One additional disclosure requirement is imposed on an attorney hired pursuant to 19-717. Such an attorney, like all attorneys in this state, is subject to the Code of Professional Responsibility set forth in Rule 225 (235 Kan. cxxxvii) of this Court. Certain provisions of that Code are pertinent to any discussion of the duties and responsibilities of an attorney retained pursuant

to K.S.A. 19-717 to assist the public prosecutor. These provide as follows:

"CANON 1

. . . .

"DR-1-102 . . . .

"(A) a lawyer shall not:

. . . .

"(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

"(5) Engage in conduct that is prejudicial to the administration of justice.

. . . .

"CANON 7

. . . .

"DR 7-102 *Representing a Client Within the Bounds of the Law.*

"(A) In his representation of a client, a lawyer shall not:

"(1) File a suit, assert a position, conduct a defense, delay a trial, or take other action on behalf of his client when he knows or when it is obvious that such action would serve merely to harass or maliciously injure another.

. . . .

"(3) Conceal or knowingly fail to disclose that which he is required by law to reveal.

"(4) Knowingly use . . . false evidence.

"(5) Knowingly make false statement of . . . fact.

"(6) Participate in the creation or preservation of evidence when he knows or it is obvious that the evidence is false.

"(7) Counsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent.

"(8) Knowingly engage in other illegal conduct or conduct contrary to a Disciplinary Rule.

"(B) A lawyer who receives information clearly establishing that:

"(1) His client has, in the course of the representation, perpetrated a fraud upon a person or tribunal shall promptly call upon his client to rectify the same, and if his client refuses or is unable to do so, he shall reveal the fraud to the affected person or tribunal.

. . . .

"DR 7-103 *Performing the Duty of Public Prosecutor or Other Government Lawyer.*

. . . .

"(B) A public prosecutor or other government lawyer in criminal litigation shall make timely disclosure to counsel for the defendant, or to the defendant if he has no counsel, of the existence of evidence, known to the prosecutor or other government lawyer, that tends to negate the guilt of the accused, mitigate the degree of the offense, or reduce the punishment."

The thrust of DR 1-102 and DR 7-102 is that the lawyer

must not knowingly participate in a suit when the lawyer knows that it is based upon false or fraudulent evidence. There is no suggestion of any such conduct in this case. DR 7-103 requires the public prosecutor to disclose the existence of evidence known to the prosecutor that tends to negate the guilt of the accused, mitigate the degree of the offense, or reduce the punishment. While DR 7-103 explicitly applies only to the public prosecutor or other government attorney, an attorney who is privately retained to assist in a criminal prosecution should not be allowed to withhold evidence which might exculpate the accused. The general requirements of DR 1-102, DR 7-102, and DR 7-103 take on special importance when an attorney assists in a criminal prosecution. Because of these ethical considerations and the nature of such an attorney's role in criminal prosecution, we hold that a lawyer who is retained under K.S.A. 19-717 to assist the public prosecutor is obligated under DR 7-103 to make the same disclosure of evidence *known to him or her* which would tend to negate guilt, mitigate the degree of the offense, or reduce the punishment as is the prosecutor. In the case at hand, if Mr. Hernandez knew of the existence of such evidence, he was under a duty to disclose it. If, for example, he knew that Cargill's inventory for the entire year 1983 showed no loss of grain at the Wichita facility, or showed no loss during the critical period during which the charges against these defendants arose, or if the inventory showed much less shortage than that which was the subject of criminal charges, he would be obligated to disclose the existence of that evidence to the defendants. Such was not the case here, and there is no suggestion whatsoever in the record of any unethical conduct on the part of Mr. Hernandez.

In summary, an attorney hired by the prosecuting witness to assist the prosecutor must participate in discovery pursuant to K.S.A. 22-3212 by disclosing requested evidence which is in the attorney's possession, custody, or control. Additionally, the attorney must disclose any evidence known to him or her which will "tend to negate the guilt of the accused, mitigate the degree of the offense, or reduce the punishment." He or she is not required, however, to search for documents and other records of the prosecuting witness which might conceivably be helpful to the defense. The prosecuting witness is not a party to the action

and its records are not in the possession of the State. A trial court has no authority to compel discovery from the complaining witness pursuant to K.S.A. 22-3212.

With these rules in mind, we turn to the specific items requested by defendants. Defendants were provided with an inventory, as the Court of Appeals noted in its opinion, which apparently included only the loss for the elevator area, and not the loss for the entire facility. A Cargill employee testified, out of the hearing of the jury, that the entire inventory would show that Cargill lost some 99,000 bushels of soybeans for the period between March 1, and May 31, 1983, and that an inventory for the period between August 1982 and August 1983 would show that Cargill lost more than 99,000 bushels of beans. The charges on which defendants were convicted involved fraudulent deliveries of slightly more than 15,500 bushels of soybeans. The second criminal case, which involved other people, involved some 10,000 bushels of beans, according to Cargill's employee. It is not clear how this inventory would have been beneficial to the defendants. As such, even if it was known to Mr. Hernandez, he was not required by DR 7-103 to disclose it. There is no indication Mr. Hernandez had the complete inventory in his possession, custody, or control. Significantly, the Cargill employee who testified about the inventory offered to furnish further information, but defendants did not follow up and secure that information. They did not cause a subpoena for the specific inventory to be issued and enforced. In short, they complain that they were not furnished with it, but they made no sincere effort to secure it, and they make no showing that it would have been exculpatory. We find no prejudice and no reversible error.

As to the June 2 tests showing how fast a truck could be unloaded, the State provided to defense counsel a document titled "Results of Tests Conducted June 2, 1983 by Cargill Employees." Although defense counsel characterized these as incomplete, there is no showing in the record that there were other more complete written reports of these tests or that the State or Mr. Hernandez had any further reports. The people who conducted the tests were called as witnesses and were subject to full cross-examination. All of this evidence was before the jury. If

defendants wished to call other witnesses who were present when these tests were conducted, they were free to do so.

All of the information regarding "tests" conducted concerning the synchronization of the clocks on the gross and tare scales and the continuous roll tape was apparently furnished to the defendants. Witnesses testified that the time clocks were not synchronized and that the clocks were reset whenever there was a power outage, and thus tests conducted sometime after the critical period would not appear to reflect the precise degree of synchronization at the time of the fraudulent deliveries. We find no evidence that there were written test reports which were not furnished to defense counsel.

Finally, we come to the videotape of May 18, 1983. This was the only tape that showed a bona fide unload of soybeans by F & M. There was no criminal charge filed regarding that unload, and witnesses testified as to the time it took to unload that truck. Cargill employees recorded over that tape, and thus it was not available for trial. Defendants claim the tape was important because it showed a bona fide unload could be completed in less than two minutes. The trial court offered to let defendants recreate this bona fide unload, but defendants did not accept that offer. Neither the State nor Mr. Hernandez destroyed the tape; Cargill employees utilized the tape to record another unload, perhaps unaware that the tape of a bona fide unload, not the subject of criminal charges, might be relevant in the later criminal trial. Another option was readily available: the recreation of the bona fide unload with the same truck, at the same scale facility, with the same load weight. We find no prejudicial or reversible error.

Next, defendants contend that they were misled by misleading and erroneous statements by the prosecution. The State contended that it was impossible to unload a truck in two minutes. There was evidence, later in the trial, that a truck could be unloaded in that time. The prosecution disclosed that the three clocks in the unloading area were not synchronized; later, the evidence indicated that the clocks were only off a few seconds on the dates of the defendants' "unloads." Defendants claim that this change, coupled with the unavailability of precise information on the degree of synchronization, so prejudiced them that a new trial is mandated.

We do not find this argument persuasive. The degree to which the clocks were out of synchronization was merely clarified as the trial progressed. Any alleged 'tests' performed later would not disclose the state of synchronization of the three clocks at the time of the disputed unloads. Further, the videotapes and continuous roll tapes concerning the questionable transactions, which were in evidence, comprise the only physical evidence of the clock times on the critical dates. Those tapes were apparently available to the defendants after the preliminary examination. Defendants were not misled or prejudiced.

Next, did the trial court err in prohibiting the defense from commenting to the jury that the May 13 unload was bona fide until evidence of its legitimacy was presented? We think not. Defendants were not charged with an offense in connection with that transaction, but the tape of that unload was offered by the State and received into evidence. The State presented extensive evidence that the May 13 unload was not a legitimate delivery. The truck veered sharply to the right as it approached the tare scale; the tarp did not move while the truck was supposedly unloading; and the truck's tare weight was recorded before the truck came to a complete stop on the tare scale. The trial court refused to let defense counsel argue to the jury that the May 13 unload was bona fide until some evidence was presented that it was a legitimate unload. As we said in *State v. Bradford*, 219 Kan. 336, 340, 548 P.2d 812 (1976), "No rule governing oral argument is more fundamental than that requiring counsel to confine their remarks to matters *in evidence*." The trial court did not err in requiring affirmative evidence that the May 13 unload was legitimate before allowing the defense to argue that to the jury.

Finally, defendant Dressel contends that the trial court committed error in preventing Dressel from presenting evidence of another similar criminal case. Defendant Strickland and a Mr. Helmer were apparently charged in another case with a similar theft by deception from Cargill at its Wichita facility. Dressel sought to introduce evidence concerning that case to establish that any losses claimed by Cargill were attributable to Helmer and Strickland, rather than to these defendants. The trial court would not admit evidence of the Helmer case until evidence was

introduced establishing that the losses attributable to Helmer and Strickland occurred at about the same time and were similar in amount to the losses herein. Dressel claims that this denied him the opportunity to present his theory of defense, and that he should have been permitted to introduce any evidence that is relevant to the case. What he overlooks is that the foundation requirement imposed by the trial court was not an arbitrary threshold, but was necessary to render the evidence relevant. Absent a showing that Cargill's losses could be traced to the Helmer defendants, evidence of this other case is not relevant to the case at bar. We find no error.

For the reasons stated above, the judgment of the Court of Appeals is reversed, and the judgment of the trial court is affirmed.