No. 97,139

Tod A. Pabst, *Appellant*, v. State of Kansas, *Appellee*.

(192 P.3d 630)

Opinion filed September 19, 2008.

*Richard Ney*, of Ney, Adams & Sylvester, of Wichita, argued the cause and was on the briefs for the appellant.

*Jared S. Maag*, deputy solicitor general, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

JOHNSON, J.: Tod A. Pabst appeals the denial of his K.S.A. 60-1507 motion for postconviction relief from his conviction for premeditated first-degree murder. Pabst raises a number of issues, none of which require us to reverse his conviction.

## FACTUAL AND PROCEDURAL OVERVIEW

In 1997, Pabst was first convicted of premeditated first-degree murder in the shooting death of his fiancée, Phoebe Harkins. However, that conviction was overturned by this court because the prosecutor's remarks in closing argument denied Pabst a fair trial. See *State v. Pabst*, 268 Kan. 501, 511, 996 P.2d 321 (2000).

Upon the retrial in 2000, the victim's parents hired a private attorney, Pedro Irigonegaray, to act as associate counsel to assist the prosecutor, pursuant to K.S.A. 19-717. Irigonegaray actively participated in the murder trial. At the time, he was also employed to assist with civil litigation which would be impacted by the outcome of the criminal trial. The jury again convicted Pabst of premeditated first-degree murder, and that conviction was affirmed by this court in *State v. Pabst*, 273 Kan. 658, 44 P.3d 1230, *cert. denied* 537 U.S. 959 (2002).

Approximately a year and a half later, on October 15, 2003, Pabst filed a K.S.A. 60-1507 motion through a retained attorney which alleged 11 grounds for relief. However, for his last ground, Pabst's attorney stated that, because of the applicable statute of limitation, he had filed the motion prior to a full investigation and review and informed the court that Pabst intended to file supplemental pleadings, with leave of court, after an examination of the record. Inexplicably, there was no activity on the motion until September 2, 2004, when Pabst's attorney withdrew as counsel.

Pabst requested appointed counsel on November 19, 2004, but apparently never returned the requisite paperwork. He then hired current counsel, Richard Ney, who entered an appearance on March 1, 2005, and several months later filed a pleading entitled "Amended Petition Pursuant to K.S.A. 60-1507." The pleading set forth 16 grounds for relief, 10 of which differed from the original motion. Pabst had not sought or obtained leave of court to file a supplemental pleading.

The State, after obtaining a continuance, filed an answer which, *inter alia*, sought to dismiss those claims which were not raised in the original 60-1507 motion because the new claims were barred by the new limitation period in K.S.A. 60-1507(f). In a reply and a separate motion to strike, Pabst argued that, under K.S.A. 60-215, he had the right to amend his motion as a matter of course at any time prior to the State filing a responsive pleading; that the claims made in both pleadings were of the same type, permitting the later claim to relate back; and that the State had failed to specifically plead a statute of limitations defense as required by the Rules of Civil Procedure.

At an evidentiary hearing on March 15, 2006, the parties first presented arguments on the statute of limitations issue. The district court ruled that Kansas law does not require the State to answer or otherwise plead to a convict's 60-1507 motion in order to refute the motion or the evidence offered in support of the motion; that it is presumed that when a movant sets out grounds for relief under K.S.A. 60-1507, he or she has listed all of the grounds upon which he or she is relying; and that a movant cannot avail himself or herself of the relation-back standard by raising an ineffective assistance of counsel claim in the original petition and then amending the petition to assert another ineffective assistance claim based on a distinct type of attorney malfeasance. The district court dismissed the allegations found in (d), (e), (f), (g), (h), (i), (j), (l), (m), and (p) of the amended "petition." The district court proceeded on the originally filed 60-1507 motion, permitting Pabst to raise the grounds that had been abandoned by the amended "petition."

Pabst and Irigonegaray testified as Pabst's witnesses. Irigonegaray related that he was retained by the victim's sister and parents to be an associate to the attorney general's office under K.S.A. 19-717 to assist with the prosecution of the murder trial. Irigonegaray admitted that he represented the victim's sister and her husband in a termination of parental rights and adoption case involving Pabst's child. At the time of the criminal retrial, Pabst had filed a motion to set aside the termination, and Irigonegaray was involved in the case. Irigonegaray's office was also involved in other civil cases involving the victim's family which were at least prompted by the murder, albeit the record is not altogether clear on the details of those cases or the extent of Irigonegaray's involvement.

Although Irigonegaray admitted involvement in the civil cases, he denied that he ever used information from the civil cases to gain an advantage in the criminal trial. However, he did admit that the murder conviction had some impact on the attempt to set aside his client's adoption of Pabst's child. Further, Irigonegaray did use the fact that Pabst had filed two civil cases involving property to argue for a hard 40 sentence based on murder for financial gain, although the sentencing court rejected the argument and refused to impose the enhanced minimum sentence.

Assistant Attorney General Stephen Maxwell testified on the State's behalf, acknowledging that he was the lead attorney on the case and had assigned the handling of several parts of the trial to Irigonegaray. Specifically, he assigned Irigonegaray the opening statement, 7 out of 25 State witnesses, 1 or 2 of the defense witnesses, and a portion of the closing argument. However, Maxwell asserted that he controlled the case and everything that Irigonegaray did on the case was subject to Maxwell's prior approval.

On July 18, 2006, the district court issued its memorandum decision denying Pabst's 60-1507 motion. Pabst timely appealed.

*STANDARDS OF REVIEW*

When an evidentiary hearing has been conducted in the district court, the standard of review for an appeal from a K.S.A. 60-1507 motion denial involves determinations of whether the factual findings of the district court are supported by substantial competent evidence and whether those findings are sufficient to support its conclusions of law. *Bledsoe v. State*, 283 Kan. 81, 88, 150 P.3d 868 (2007). "The ultimate denial of the 60-1507 motion involves a legal question requiring independent appellate review." *Drach v. Bruce*, 281 Kan. 1058, 1063, 136 P.3d 390 (2006), *cert. denied* 549 U.S. 1278 (2007).

To the extent that our decision turns on Pabst's due process claim or on our interpretation of statutes, we have an unlimited review. See *State v. Robinson*, 281 Kan. 538, 539-40, 132 P.3d 934 (2006).

*CONFLICT OF INTEREST*

In his original motion, Pabst asserted that his "rights were denied" when a special prosecutor hired by the victim's family usurped the role of the State, "thereby placing the Petitioner in the position of being prosecuted by victims of the crime." In the "Amended Petition" filed by Ney, Pabst argued that his trial was rendered fundamentally unfair by Irigonegaray's participation because of a conflict of interest, and that the existence of the conflict of interest violated the Due Process Clause of the 14th Amendment.

The district court first determined that there were two reasons why the issue was not properly before the court on a 60-1507 motion. Pointing to Supreme Court Rule 183(c)(3) (2007 Kan. Ct. R. Annot. 243) and *Johnson v. State*, 271 Kan. 534, 24 P.3d 92 (2001), the district court noted that K.S.A. 60-1507 cannot be used as a substitute for an appeal or as a second appeal of mere trial errors, unless those errors affect constitutional rights and there were exceptional circumstances excusing the failure to appeal them. The district court found no exceptional circumstances excusing Pabst from raising the issue in his direct appeal. Further, the district court specifically found that trial counsel knew of the potential conflict of interest issue and failed to timely object or raise the issue before the district court, thereby failing to preserve the issue for appeal.

However, in the alternative, the district court reviewed cases which had dealt with the issue of prosecutors with a conflict of interest. The court found this case to be factually distinguishable from the others, principally because Pabst did not seek disqualification before the trial court and because Irigonegaray was not the sole or controlling prosecutor, but rather participated under the direct supervision of the assistant attorney general. Moreover, the district court concluded that it is not structural error when a private attorney, retained under K.S.A. 19-717, has a conflict of interest "unless the private attorney effectively controlled critical prosecutorial decisions." In this case, the district court found that any error that may have occurred was subject to a harmless error analysis.

On appeal, Pabst's first four issues involve the alleged conflict of interest of Irigonegaray. First, he argues that Irigonegaray's participation in the prosecution while laboring under a conflict of interest violated K.S.A. 19-705 and the Due Process Clause of the 14th Amendment, rendering his trial fundamentally unfair. Next, Pabst challenges the district court's holding that he could not raise the issue in a 60-1507 motion, arguing in the alternative that (1) the conflict of interest constituted structural error which could be raised for the first time in a 60-1507 motion; or (2) the ineffective assistance of appellate counsel in failing to raise the issue on the

direct appeal provides the requisite exceptional circumstances for first-time review. Finally, in separate issues, Pabst complains that his trial counsel should have moved for the disqualification of Irigonegaray and that his appellate counsel should have raised the conflict of interest issue on direct appeal.

*Statutory Provisions*

Pabst's initial complaint about being placed in a position to be prosecuted by the victims is refuted in some measure by a specific statute authorizing a victim to be represented in the prosecution. K.S.A. 19-717 provides:

"That the prosecuting witness in any criminal action or proceeding may, at his own expense, employ an attorney or attorneys to assist the county attorney to perform his duties in any criminal action or proceeding under any of the laws of the state of Kansas, and such attorney or attorneys shall be recognized by the county attorney and court as associate counsel in such action or proceeding, and no prosecution shall be dismissed over the objection of such associate counsel until the reason of the county attorney for such dismissal, together with the objections thereto of such associate counsel, shall have been filed in writing, argued by counsel, and fully considered by the court."

It is noteworthy that the statute contemplates that the outside attorney will be employed and paid by the prosecuting witness, obviously suggesting an attorney/client relationship between the victim and one of the prosecutors. See *State v. Dressel*, 241 Kan. 426, 434, 738 P.2d 830 (1987) (the complaining witness is the client of an attorney hired under K.S.A. 19-717). Further, leave of court is not required, but rather the judge, as well as the county attorney, "shall" recognize the victim's attorney as an associate prosecutor. Moreover, the victim's employment of an associate counsel places some restrictions on the county attorney's discretion to dismiss the case, which is ordinarily unrestrained. See *State v. Williamson*, 253 Kan. 163, Syl. ¶ 1, 853 P.2d 56 (1993) (county or district attorney controls criminal prosecutions and is the person who has the authority to dismiss any charge).

Although the district court did not discuss K.S.A. 19-705, Pabst offers that provision as an alternative to his due process arguments. That statute, in its entirety, provides:

"No county attorney shall receive any fee or reward from or on behalf of any prosecutor or other individuals, except such as are allowed by law for services in any prosecution or business to which it shall be his official duty to attend, nor be concerned as attorney or counsel for either party other than the state or county, in any civil action depending upon the same state of facts upon which any criminal prosecution, commenced but undetermined, shall depend; nor shall any county attorney while in office be eligible to or hold any judicial or other county office whatsoever." K.S.A. 19-705.

### Due Process

Pabst relies heavily on *Young v. United States, ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 95 L. Ed. 2d 740, 107 S. Ct. 2124 (1987). There, the federal district court appointed the attorneys who had represented the beneficiary of a permanent injunction in a civil action to prosecute a criminal contempt action against the adverse civil party based upon a violation of the injunction. The United States Supreme Court reversed the criminal convictions. Four justices found that the appointment of an interested prosecutor was a fundamental error that required reversal without regard to the facts and circumstances of the case. 481 U.S. at 809-810. One justice agreed with the reversal because appointment of an interested party's counsel as special prosecutor exceeded the district court's power under Article III of the United States Constitution. 481 U.S. at 815. Three justices found an abuse of discretion but believed a harmless error analysis was proper. 481 U.S. at 825-27. One justice found no error. 481 U.S. at 827.

While acknowledging that it was not the majority decision of the Court, Pabst nevertheless embraces the opinion of those justices who would find that appointing counsel for an interested party to prosecute the criminal proceedings is fundamental error. That opinion's underlying rationale was that a prosecutor represents the sovereignty, the interest of which is not to win the case, but rather to see that justice is done, *i.e.,* " 'the twofold aim of which is that guilt shall not escape nor innocence suffer.' " 481 U.S. at 803 (quoting *Berger v. United States*, 295 U.S. 78, 88, 79 L. Ed. 1314, 55 S. Ct. 629 [1935]). However, an appointed prosecuting attorney who is also representing a party with an interest in the outcome of the prosecution would also owe an ethical duty to the nonsovereignty

client to advocate his or her interests, *i.e.*, the attorney would be serving two masters whose interests were not identical. The plurality found that regardless of whether the appointment of a conflicted attorney actually results in prosecutorial impropriety, the harm is in "the *potential* for private interest to influence the discharge of public duty." (Emphasis added.) 481 U.S. at 805.

Pabst also points us to the decisions of other states which have found a due process violation where the prosecuting attorney in a criminal case also represented the victims in a related civil matter. See, *e.g.*, *Cantrell v. Com.*, 229 Va. 387, 394, 329 S.E.2d 22 (1985) (private prosecutor who has a civil interest in the case "so infects the prosecution with the possibility that private vengeance has been substituted for impartial application of the criminal law, that prejudice to the defendant need not be shown"); *State v. Eldridge*, 951 S.W.2d 775, 782 (Tenn. Crim. App. 1997); and *Com. v. Eskridge*, 529 Pa. 387, 604 A.2d 700 (1992). But *cf. Brown v. State*, 242 Ga. 536, 250 S.E.2d 438 (1978) (permissible for a victim's family to hire a special prosecutor so long as the special prosecutor was subject to the direction and control of the district attorney; special prosecutor's representation of the victim's family in civil litigation arising from victim's death was not grounds for disqualification). The principal rationale for those foreign decisions was that the conflicted attorney could not simultaneously serve the divergent interests of two clients.

While the argument that concurrently serving two masters is a per se violation of defendant's due process rights has surface appeal, it dissipates upon closer scrutiny. First, defendant is not one of the clients that is directly subjected to the alleged divided loyalties; the alleged conflict is between the private attorney's duty to the victim on the one hand and to the State of Kansas on the other. Except to the extent that Pabst may be a beneficiary of the duties Irigonegaray owed to the State of Kansas, his own legal representation was not conflicted. Moreover, when the integrity of a defendant's own legal representation is called into question because of a conflict of interest, the basis for relief is the 6th Amendment right to counsel, not a 14th Amendment due process violation. See, *e.g.*, *State v. Jenkins*, 257 Kan. 1074, 898 P.2d 1121 (1995).

Secondly, with or without employed counsel, a victim is involved in the criminal prosecution. Granted, we have said that a complaining witness is not a party in the criminal action. *Dressel*, 241 Kan. at 436. However, the legislature has clearly indicated that the views and concerns of a victim should be considered by the court under appropriate circumstances. See K.S.A. 74-7333 (creating a bill of rights for victims of crime). Moreover, this State has created a Crime Victims Compensation Fund, K.S.A. 74-7332, which recognizes that victims may be entitled to financial redress as a result of the defendant's actions. Obviously, that redress may well be sought through a separate civil action.

Finally, K.S.A. 19-717 appears to implicitly set up an inherent conflict, regardless of the existence of concurrent civil litigation. As noted, the statute provides for the prosecuting witness to employ and pay for the "associate counsel." With regard to the loyalties owed because of that employment, we have said "[a]n attorney is obligated to act in the best interests of his or her client which, in the case of an attorney hired pursuant to K.S.A. 19-717, is the complaining witness who retained the attorney's services." *Dressel*, 241 Kan. at 434. Yet, *Dressel* also recognized that an attorney retained by the victim pursuant to K.S.A. 19-717 is "hired to *assist* the prosecution." 241 Kan. at 434. As such, the *Dressel* court found the victim-retained associate counsel in that case to be subject to at least a portion of the ethical rules explicitly applicable to prosecutors, then designated as DR 7-103 and currently contained in Rule 3.8 of the Kansas Rules of Professional Conduct (KRPC) (2007 Kan. Ct. R. Annot. 525). *Dressel* recognized that the "peculiar role of an attorney who is privately retained by a complaining witness to assist in a criminal prosecution" would necessitate compromise and a balancing of the interests the attorney represents. 241 Kan. at 434.

Given that K.S.A. 19-717 implicitly authorizes a serving-two-masters scenario, we cannot find that the associate counsel's concurrent representation of the victim in a separate civil action creates a per se violation of the defendant's due process rights. Nevertheless, all attorneys are subject to the KRPC, regardless of what legislative enactments might implicitly permit.

KRPC 1.7(a)(2) generally precludes a lawyer's representation of a client, if "there is a substantial risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer." 2007 Kan. Ct. R. Annot. 440. If the associate counsel's responsibilities in the civil action require that the defendant be convicted in the criminal action, that attorney's representation of the State of Kansas may be materially limited with respect to performing the prosecutor's duty to assure that justice is done. Moreover, if the associate counsel's materially limited ability to properly assist in the prosecution prejudices the defendant's right to a fair and impartial trial, the defendant would have standing to object to the associate counsel's participation in the prosecution. In other words, although not a due process violation, an objectionable conflict of interest may exist under the facts and circumstances of a particular case.

### Statutory Conflict

Pabst also argues that Irigonegaray's participation in the criminal proceedings violated the public policy of this State, as expressed in K.S.A. 19-705. Specifically, he contends that the assistant attorney general assigned to prosecute him was subject to the statute's prohibition against acting as an attorney or counsel for a nongovernmental party in a civil action which depends on the same state of facts as the ongoing criminal prosecution. Pabst then argues that the prohibition is imputed to Irigonegaray, as part of the prosecution "firm." He cites to KRPC 1.10, which provides that none of the lawyers associated in a firm shall represent a client when any one of them practicing alone would be prohibited from doing so. 2007 Kan. Ct. R. Annot. 461.

The explicit language of K.S.A. 19-705 makes its prohibitions applicable to a "county attorney." The question becomes whether one hired "to assist the county attorney to perform his duties" under K.S.A. 19-717 is likewise subject to those prohibitions.

In *Dressel*, the issue was the extent to which an attorney hired under K.S.A. 19-717 was subject to the discovery provisions of K.S.A. 22-3212, which require the "prosecuting attorney" to pro-

vide the defendant with access to certain evidentiary items. The *Dressel* court declared that a K.S.A. 19-717 attorney was not a "prosecuting attorney," as defined by K.S.A. 22-2202(17), so that the discovery requirements of K.S.A. 22-3212 were not explicitly applicable to him or her. Rather, *Dressel* described the victim-retained attorney as "merely associate counsel, employed to assist the prosecuting attorney, and [who] did not have control over the case." 241 Kan. at 434. Under that rationale, one could opine that the prohibitions on a "county attorney" are not explicitly applicable to a K.S.A. 19-717 associate counsel.

However, the *Dressel* opinion did not flesh out its rationale for finding that a K.S.A. 19-717 attorney was not a "prosecuting attorney." The definition of a "prosecuting attorney" included, both then and now, "an assistant county or district attorney and any special prosecutor whose appearance is approved by the court." K.S.A. 22-2202(17). One might find it difficult to grasp the distinction between an assistant county attorney and an attorney hired to assist the county attorney. Moreover, notwithstanding its definitional declaration, *Dressel* nevertheless required the "associate counsel" to comply with a portion of the prosecuting attorney's discovery obligations under K.S.A. 22-3212 and further subjected that attorney to the ethical obligations set forth in the disciplinary rules then designated as DR 1-102, DR 7-102, and DR 7-103, as if he or she were a prosecuting attorney. 241 Kan. at 434-36.

Granted, we have pointed out that there is an inherent difference between the attorney occupying the public office of prosecutor and an attorney hired by the prosecuting witness to assist the public prosecutor. The public prosecutor is expected to be conflict-free, whereas we have acknowledged that the victim-retained "assistant" comes to the table with built-in divided loyalties. Nevertheless, we need not exacerbate the inherent conflict by absolving the retained attorney of all of the prosecutorial constraints of K.S.A. 19-705. Therefore, we find the K.S.A. 19-717 attorney is subject to the statutory conflict rule of K.S.A. 19-705, *i.e.*, the victim-retained attorney is precluded from representing a party in a civil action that depends on the same state of facts as the ongoing crim-

inal prosecution in which the attorney is assisting the public prosecutor.

### Structural Error

In the context of arguing that he could raise the conflict issue for the first time on appeal, Pabst contends that the existence of a conflict of interest for Irigonegaray constitutes structural error. If that contention is correct, our finding of a violation of the statutory conflict rule would not be subject to a harmless error analysis. However, structural errors subject to automatic reversals exist in only very limited cases.

"Structural errors 'are so intrinsically harmful as to require automatic reversal (*i.e.*, "affect substantial rights") without regard to their effect on the outcome.' *Neder v. United States*, 527 U.S. 1, 7, 144 L. Ed. 2d 35, 119 S. Ct. 1827 (1999). Automatic reversal is required in limited situations. See, *e.g.*, *Johnson v. United States*, 520 U.S. 461, 468-69, 137 L. Ed. 2d 718, 117 S. Ct. 1544 (1997) (citing *Gideon v. Wainwright*, 372 U.S. 335, 9 L. Ed. 2d 799, 83 S. Ct. 792 [1963]) (complete denial of counsel); *Sullivan v. Louisiana*, 508 U.S. 275, 282, 124 L. Ed. 2d 182, 113 S. Ct. 2078 (1993) (defective reasonable doubt instruction); *Vasquez v. Hillery*, 474 U.S. 254, 264, 88 L. Ed. 2d 598, 106 S. Ct. 617 (1986) (racial discrimination in selection of grand jury). However, the vast majority of constitutional errors fall within the broad category of trial error subject to harmless error review. *People v. Flood*, 18 Cal. 4th 470, 499-500, 76 Cal. Rptr. 2d 180, 957 P.2d 869 (1998) (citing *Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 [1967] )." *State v. Hill*, 271 Kan. 929, 934-35, 26 P.3d 1267 (2001), *abrogated on other grounds by State v. Voyles*, 284 Kan. 239, 160 P.3d 794 (2007).

Pabst does not identify a substantial right that has been unequivocally violated. He cites to a portion of the *Young* opinion that says the harm in having an interested party bring a contempt prosecution is that it creates *"opportunities* for conflicts to arise" and creates "at least the *appearance* of impropriety." 481 U.S. at 806. However, we are directed by K.S.A. 60-261 to "disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." The mere potential for having an effect on substantial rights is not excepted from the harmless error rule.

Moreover, even in the context of the denial of the most fundamental and substantial right to counsel for a criminal defendant, which is ordinarily structural error, a showing of a *potential* conflict of interest is not always sufficient. "Under *Cuyler,* in the face of a

silent record, where the defendant makes no objection before the trial court, the *possibility* of a conflict of interest is not sufficient to impugn a criminal conviction. 446 U.S. at 348-50." (Emphasis added.) *Jenkins*, 257 Kan. at 1084.

In short, we find that the violation of the conflict rule set forth in K.S.A. 19-705 is subject to the harmless error rule.

### *Harmless Error*

Pabst attempts to illustrate how his substantial right to a fair trial was affected by Irigonegaray's conflict of interest by describing instances where the associate counsel purported to represent the interests of the victims, rather than the State. While those examples highlight the dual nature of Irigonegaray's loyalties, Pabst does not persuade us that they illustrate an unfair impact on the criminal trial.

Pabst complains that Irigonegaray and his firm advocated for prohibiting Pabst from sending mail from the jail to A.P., the minor child of Pabst and the decedent. Ultimately, the district court ruled that it had no authority in the criminal action to contravene an administrative regulation of the jail. Thus, this squabble was outside the context of the criminal prosecution. Further, it had nothing to do with any of the civil actions with which Pabst asserts a conflict of interest.

Next, Pabst finds fault with Irigonegaray's advising the court that A.P.'s guardian opposed Pabst's motion to interview the child. However, Irigonegaray clearly advised the criminal court:

"And for the record to be clear, the State's position in this is not any different with me being involved, because I'm working at the direct instructions of Mr. Maxwell, it's just that having been assigned by the State the responsibility to check with the family regarding their position on that issue, I have been told and I have reported to Mr. Maxwell, chief counsel in this case, that the family does not, and will not allow the Defendant to interview [A.P.]"

Ultimately, the district court ruled that the State had no authority to deny Pabst an interview with the minor, but that the court did not have the authority to force the witness to submit to the interview. Again, this skirmish does not illustrate a fair trial denial.

Pabst also complains about a motion to quash subpoena but does not relate that collateral matter to the fair conduct of the trial. Likewise, he believes that Irigonegaray should not have advocated for the hard 40 sentence by bringing up the civil cases in which Pabst was seeking money and property as a consequence of the victim's death. However, given that the district court refused to impose the hard 40, this argument is the stereotypical harmless error.

In conclusion, we find that Pabst has failed to establish that any conflict of interest that Irigonegaray may have had as a result of concurrently representing the victims in civil matters substantially affected the criminal prosecution so as to impair Pabst's right to a fair trial.

## EXCEPTIONAL CIRCUMSTANCES

Pabst also challenges the district court's alternative ruling that he had failed to show any exceptional circumstances which would excuse the failure to raise the issue on direct appeal. See Supreme Court Rule 183(c)(3) (2007 Kan. Ct. R. Annot. 243). He submits two reasons to find that the district court erred.

First, he argues that Irigonegaray's participation in the criminal proceedings constituted structural error and such errors may be raised for the first time in a K.S.A. 60-1507 motion. He cites to *Crutcher v. State*, 27 Kan. App. 2d 674, 8 P.3d 1, *rev. denied* 268 Kan. 885 (1999), which in an appeal of a 60-1507 denial found that a failure to give a unanimity instruction was structural error, requiring reversal. Pabst does not note that the *Crutcher* structural error ruling was subsequently abrogated. See *State v. Banks*, 273 Kan. 738, 743, 46 P.3d 546 (2002). Nevertheless, the short answer is that the potential conflict of interest of an attorney employed pursuant to K.S.A. 19-717 is not structural error, but rather it is subject to a harmless error analysis.

Secondly, Pabst contends that he received ineffective assistance of counsel when his appellate attorney did not raise the conflict issue on direct appeal and that such a failure by appellate counsel constitutes an exceptional circumstance. See *Bledsoe v. State*, 283 Kan. 81, 88-89, 91, 150 P.3d 868 (2007) (a 60-1507 movant can

overcome the failure to raise an issue at trial or on direct appeal and demonstrate exceptional circumstances by persuading the appellate court that there was ineffective assistance of trial counsel in failing to object regarding an issue; there was ineffective assistance of direct appeal counsel in failing to raise the issue; or there was newly discovered evidence or an unforeseeable change in circumstances or constitutional law unknown to counsel and movant at time of trial and direct appeal). However, Pabst fails to establish that his appellate counsel was constitutionally ineffective.

## INEFFECTIVE TRIAL COUNSEL

Pabst contends that his trial counsel was ineffective in failing to move for the disqualification of Irigonegaray. A claim alleging ineffective assistance of counsel presents mixed questions of fact and law requiring de novo review. *Bledsoe*, 283 Kan. at 91.

To obtain a reversal of a conviction based upon ineffective assistance of trial counsel, it is insufficient to surmise, with the benefit of hindsight, that another attorney would have tried the case differently. First, the defendant must establish that counsel's performance was constitutionally deficient, which requires a showing that counsel made errors so serious that his or her performance was less than that guaranteed to the defendant by the Sixth Amendment to the United States Constitution. Second, the defendant must establish that counsel's deficient performance prejudiced the defense. This requires a showing that counsel's errors were so serious as to deprive the defendant of a fair trial. 283 Kan. at 90.

The judge presiding over the 60-1507 proceedings also presided at the criminal trial. The judge observed that, at trial, Pabst's counsel "engaged in a fierce motion practice; engaged in a lengthy Pretrial Conference; frequently met with the Defendant; and vigorously cross-examined the State's witnesses and competently presented the Defendant's witnesses." " 'Much deference and reliance must be placed upon the wisdom and determination of the trial judge who saw all of the [criminal case] first hand as [it] happened.' " *Gilkey v. State*, 31 Kan. App. 2d 77, 78, 60 P.3d 351, *rev. denied* 275 Kan. 963 (2003) (quoting *Chamberlain v. State*, 236 Kan. 650, 659-60, 694 P.2d 468 [1985]).

Pabst takes exception to the district court's hypothesis that trial counsel may have refrained from seeking Irigonegaray's disqualification for strategic reasons. He argues that the court should not fabricate tactical excuses for trial counsel's errors. Pointedly, however, the reason the district court had to speculate on trial counsel's strategy is that Pabst did not call his trial attorneys to testify at the evidentiary hearing on his 60-1507 motion. An important reason for requiring ineffective assistance of counsel claims to originate in the district court is to allow the allegedly ineffective counsel an opportunity to explain his or her reasoning and actions. See, *e.g.*, *United States v. Galloway*, 56 F.3d 1239, 1240 (10th Cir. 1995). In the absence of that testimony, our scrutiny is highly deferential. There is a strong presumption when there is no contrary evidence that counsel's conduct falls within the wide range of reasonable professional assistance. *State v. Betts*, 272 Kan. 369, 387-88, 33 P.3d 575 (2001).

It is important to note that the decision facing defense counsel was not whether to object to the participation of a victim-retained attorney. K.S.A. 19-717 was going to permit that participation, regardless of how vehemently defense counsel may have objected. The only possible choice for the defense was as to who would be representing the victims. Defense counsel may well have preferred to have Irigonegaray stay involved in the trial, rather than another attorney who might be hired to replace him. In that regard, Pabst's contention that he asked his attorney to move for Irigonegaray's disqualification would add support to the notion that the decision not to do so was a reasoned choice, rather than ineffective representation. Accordingly, we find that the district court did not err in finding that Pabst had constitutionally effective representation at his trial.

*INEFFECTIVE APPELLATE COUNSEL*

Next, Pabst argues that his appellate counsel was constitutionally ineffective for failing to make an issue of Irigonegaray's conflict in the direct appeal. He contends that he told his appellate attorney to raise the conflict issue on direct appeal, but counsel did not do so. Moreover, he asserts that a reasonably competent appellate

attorney would have recognized that the conflict created a structural error which could be appealed despite trial counsel's failure to object. We disagree.

Again, we do not have the benefit of any testimony from the allegedly ineffective appellate attorney as to the thought process that went into the decision to reject Pabst's requested issue. Accordingly, we will afford considerable deference to counsel, presuming that the choice of issues to present on direct appeal fell within the wide range of reasonable professional assistance. See *Betts*, 272 Kan. at 387-88.

At the time of the appeal, the appellate courts of this State had not considered whether K.S.A. 19-705 applied to a victim-retained attorney under K.S.A. 19-717. There certainly was no precedent for declaring a violation of K.S.A. 19-705 to be structural error that could be reviewed on appeal without preserving the issue. Indeed, we have decided today that it is not. In short, Pabst failed to establish his claim of ineffective assistance of appellate counsel.

## FAILURE TO IMPEACH WITNESS

Pabst asserts that his trial counsel was ineffective by failing to impeach the testimony of the medical examiner, Dr. Mitchell, on two bases. First, Pabst argues that trial counsel should have brought out allegations contained in news reports that Dr. Mitchell resigned a medical examiner post in New York because of claims that he donated body parts for research without relatives' permission and violated court orders to rebury bodies after exhuming them to perform tests. Second, Pabst claims Dr. Mitchell's testimony at the parental termination hearing was inconsistent with his trial testimony.

The State concedes that generally great latitude is given in the cross-examination of experts in order to adequately test their qualifications and knowledge, and the bases for their opinions. See *Pope v. Ransdell*, 251 Kan. 112, 123, 833 P.2d 965 (1992). However, the State also points out that a witness cannot be impeached with extrinsic evidence dealing with a collateral matter. *Stickney v. Wesley Med. Center*, 244 Kan. 147, 155, 768 P.2d 253 (1989).

At trial, Dr. Mitchell testified that he held medical licenses in Kansas, New York, and North Carolina, and that he was board certified in anatomic pathology, clinical pathology, and forensic pathology. He testified about his autopsy findings and gave demonstrations about how the shots had to have been fired in order to inflict the injuries he found on the victim.

Dr. Mitchell's testimony was prejudicial to the defense by effectively refuting Pabst's version of the shooting incident. Therefore, it would have behooved the defense to impeach Dr. Mitchell's expertise. However, Pabst fails to make any connection between the alleged misconduct in New York and the doctor's ability to perform and draw conclusions from the autopsy. We question whether such a cross-examination would have been proper and certainly cannot fault defense counsel for declining to attempt to impeach Dr. Mitchell with collateral, irrelevant claims from the media.

With respect to his second complaint, Pabst makes his argument better than it is by taking Dr. Mitchell's testimony at the termination hearing out of context. Dr. Mitchell testified during the termination hearing in relevant part as follows:

"Q. The first shot, then, that goes through the arm, what consequences would it have had immediately on Miss Harkins?

"A. It would immediately incapacitate her lower extremities. It would immediately determine that she was going to die, but she would still have powers of mentation, she would still have the ability to move her left arm normally, she could move her upper arm on the right but would lose the strength and continuity of her arm because the bone is gone.

"Q. When that bone is—would that be the humerus?

"A. Yes.

"Q. When the humerus was shattered why would that make her right lower arm and hand not usable?

"A. Well, there are a couple of things. First off, you've got a lot of shock here, you're damaging nerves as well as the blood vessels and damaging muscles. You've lost structural continuity of that arm so that you're not going to be able to control where the lower arm is as you normally would because the structure that you depend upon is gone.

"Q. Would someone who has received that type of a wound to the right arm be able to with the right hand pull the hammer on the revolver while they're holding it to the back of their head?

"A. I do not expect them to be able to bring the gun up. They, theoretically you still have grasp because you're depending upon lower arm musculature for that, yes, but you're not going to be able to place the weapon.

"Q. If then the second shot is—strike that. What was the trajectory of the second shot?

"A. This came from right to left going across the back of the head, going through the back of the brain."

At the termination hearing, Dr. Mitchell said that it was "well beyond" a reasonable degree of medical certainty that the victim did not have her hand on the gun when it was shot.

At retrial, Dr. Mitchell testified in relevant part:

"Q. And would you describe to the jury what that anatomical injury was?

"A. In this instance, the humerus was shattered. What you've got is bone that extends from the shoulder down to the elbow, which would be down below the picture here, there is a single bone in the upper arm, that bone was shattered and had lost its structure and ability to support the arm.

"Q. What impact does that injury have on someone's ability to use that arm with any strength?

"A. They would remove that ability. You can wiggle your shoulder, you might be able to do some movement where you have a loosely hanging arm, but you're not going to have coordinated effort of that arm. It has gone through an area where it has not only damaged the bone, but the shock of this particular gunshot is going to damage some blood vessels, and it's going to damage nerves, it's going to concussed [sic] the nerves, so it's highly unlikely that you can even get a nerve signal beyond the shoulder, well, actually beyond the level of the gunshot down to the hands. You certainly will not have the structural strength to allow this arm to be used to reach out for something.

"Q. Assuming for a second that Phoebe Harkins, after the first shot, wished to have held a revolver away from her in reverse fashion and pull the trigger, would she have been able to do so?

"A. No.

"Q. Why not?

"A. She did not have the necessary physical structure left to accomplish that. Her arm was damaged on the right. The humerus was simply—it was fragmented. It was not a matter of simply a crack in it, it was fragmented. She did not have structural support. It was floppy. Plus, with the energy of transfer of this particular projectile as it goes through shattering the humerus, damaging the soft tissues, it is very unlikely that she even had use of nerves beyond the point of that."

We do not perceive that Dr. Mitchell's testimony at retrial was inconsistent with his termination hearing testimony. Therefore, trial counsel had no ammunition with which to impeach the doc-

tor's testimony. Accordingly, we find that Pabst did not meet his burden to show counsel's performance was objectively unreasonable.

*AMENDED PLEADINGS*

Pabst's amended motion included some of the claims from his original motion, as well as 10 new claims that were not included in the original pleading. The State did not file a response until after the amended motion was filed. The district court found that the new claims did not relate back to the original motion and dismissed Pabst's new claims as time-barred by K.S.A. 60-1507(f)(1). The specific new claims at issue were set forth in the amended motion as follows:

(d) trial counsel was ineffective because he failed to adequately investigate and prepare for the testimony of Pabst's forensic expert, Dr. Jay Dix, which resulted in the jury hearing testimony that was damaging for Pabst;

(e) trial counsel was ineffective for failing to object when Dr. Dix commented on the credibility of Pabst's former trial testimony;

(f) trial counsel was ineffective for failing to object when the State's forensic expert, Dr. Erik Mitchell, testified about the credibility of Pabst's testimony;

(g) trial counsel was ineffective in having failed to object to Dr. Mitchell's testimony that this was a homicide and not an accident;

(h) trial counsel was ineffective for failing to object when Dr. Mitchell commented on areas outside of his expertise;

(i) appellate counsel was ineffective for failing to raise on direct appeal that Dr. Mitchell gave improper opinion testimony that invaded the province of the jury;

(j) trial counsel was ineffective for failing to object to the improper opinion testimony of law enforcement officers concerning crime scene evidence and how the crime occurred;

(l) trial counsel was ineffective for failing to investigate and/ or test hairs and other debris taken from the victim that could

have supported the defense theory that there was a struggle between Pabst and the victim for the gun;

(m) appellate counsel was ineffective for failing to raise on direct appeal the issue that the jury witnessed Pabst being unshackled before he entered the courtroom;

(p) Pabst was denied his constitutional right to effective assistance of counsel by the cumulative errors and omissions made by trial counsel.

Resolution of this issue involves the interpretation of statutes, which is a question of law. This court has unlimited review over questions of law and is not bound by the trial court's interpretation. *State v. Bryan*, 281 Kan. 157, 159, 130 P.3d 85 (2006).

K.S.A. 60-1507 was amended, effective July 1, 2003, to add a 1-year time limitation for bringing an action. L. 2003, ch. 65, sec. 1. Subsequently, the Court of Appeals found that those individuals who had preexisting claims had 1 year from the effective date of the 2003 amendment to file a 60-1507 motion. *Hayes v. State*, 34 Kan. App. 2d 157, 161-62, 115 P.3d 162 (2005). Therefore, Pabst had until June 30, 2004, to file his 60-1507 motion.

Pabst's original motion was filed by counsel on October 15, 2003, well within the time limitation. His amended motion was filed by new counsel on July 15, 2005, well outside the limitation period. The district court found that Pabst's new claims did not relate back to the original motion and were therefore barred by the limitation in K.S.A. 60-1507(f)(1) as applied in *Hayes*.

Pabst argues that the district court's ruling fails to recognize that he had an absolute right under the Rules of Civil Procedure, K.S.A. 60-215(a), to amend his 60-1507 motion at any time prior to a responsive pleading being filed by the State. The relevant portions of K.S.A. 60-215 are as follows:

"(a) *Amendments.* A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, the party may so amend it at any time within 20 days after it is served. Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires. . . .

. . . .

"(c) *Relation back of amendments*. An amendment of a pleading relates back to the date of the original pleading when:

(1) The claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading."

If we look solely at the statutes, the terms utilized would dictate against applying K.S.A. 60-215 in the context of a 60-1507 proceeding. K.S.A. 60-1507(a), entitled *"Motion attacking sentence,"* permits a prisoner in custody to "move the court which imposed the sentence to vacate, set aside or correct the sentence." In other words, a 60-1507 proceeding is commenced with a *motion*, notwithstanding Pabst's use of the word, "Petition," in the caption of his latest filing. K.S.A. 60-203 suggests that a "petition" is used to commence a new civil action. Further, K.S.A. 60-215 speaks to the amendment of "pleadings." K.S.A. 60-207(a), entitled *"Pleadings,"* describes the pleadings which are permitted, and a motion is not described therein as a "pleading." Therefore, an attempt to amend a *motion* is not governed by the provisions applicable to the amendment of a *pleading*.

However, these technical distinctions are arguably obscured by our Supreme Court Rule 183, which governs the procedure under K.S.A. 60-1507. In relevant part, subsection (a), entitled "Nature of Remedy," states:

"K.S.A. 60-1507 is intended to provide in a sentencing court a remedy exactly commensurate with that which had previously been available by habeas corpus in district courts in whose jurisdiction the prisoner was confined. A motion challenging the validity of a sentence is *an independent civil action which should be separately docketed*, and the procedure before the trial court and on appeal to the Court of Appeals is *governed by the Rules of Civil Procedure insofar as applicable*." (Emphasis added.) 2007 Kan. Ct. R. Annot. 243.

The suggestion that a motion commences a new civil action is hard to reconcile with the aforementioned statutory definitions. Moreover, one could argue that a motion which serves the same purpose as a petition, *i.e.*, which commences an independent, separately docketed civil matter, should be treated the same as a "pleading" within the meaning of K.S.A. 60-215, notwithstanding the assigned label.

On the other hand, our directive is that the Rules of Civil Procedure will govern "insofar as applicable." K.S.A. 60-215(a) speaks to two time frames where an amendment can be made as a matter of course, before the responsive pleading is served or within 20 days of service if a responsive pleading is not permitted. Neither circumstance describes the 60-1507 motion scenario.

As the State points out, there is no statutory requirement that it file a responsive pleading under K.S.A. 60-1507. *Cf.* K.S.A. 60-1504 (the person to whom a K.S.A. 60-1501 writ of habeas corpus is directed shall file an answer within 72 hours after the writ is served or at another time as specified in the writ). Moreover, in *Tipton v. State*, 194 Kan. 705, 711, 402 P.2d 310 (1965), this court held that it was neither necessary nor required that the State answer or otherwise plead to the 60-1507 motion in order to refute the allegations of the motion or the evidence offered in support of those allegations. On the other hand, nothing in the statute or our rules makes it impermissible for the State to file a responsive pleading. Thus, neither circumstance described in K.S.A. 60-215(a) accurately describes the procedural posture of a 60-1507 proceeding and, therefore, that rule of civil procedure would not be "applicable."

Pabst urges us to follow the decision of the Ohio Court of Appeals in *State v. Wilkins*, 127 Ohio App. 3d 306, 712 N.E.2d 1255 (1998). *Wilkins* found that a petitioner filing a postconviction petition had an absolute right to amend before a responsive pleading was filed. 127 Ohio App. 3d at 310-12. Although Pabst points out that the Ohio Rule of Civil Procedure governing amendments is identical to our K.S.A. 60-215(a), he fails to mention that the Ohio statute governing postconviction proceedings differs significantly from our K.S.A. 60-1507 procedure. In Ohio, a response is required. Specifically, the prosecuting attorney shall respond by answer or motion within 10 days of the docketing of a petition for relief or at some other time set by the court. Ohio Rev. Code Annot. § 2953.21 (D) (Anderson 2003). That significant distinction renders *Wilkins* unpersuasive.

Although Pabst neither sought nor obtained leave of court to amend his motion, the district court nevertheless considered

whether the new issues in the purported amendment would be barred by the statute of limitations. In its memorandum decision, the district court relied on the body of law developed under the federal habeas statute, 28 U.S.C. § 2255 (2000). Specifically, the court cited to *Mayle v. Felix*, 545 U.S. 644, 162 L. Ed. 2d 582, 125 S. Ct. 2562 (2005), and the parties extensively discuss that decision in their briefs. In *Mayle*, the United States Supreme Court held that an amended habeas petition does not relate back and escape the 1-year time limitation of the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2244(d)(1), when the amended petition asserts a new ground for relief supported by facts that differ in both time and type from those set forth in the original pleading. 545 U.S. at 650.

Pabst argues that all of his new claims involve his trial attorney's conduct at the retrial, so they meet the time and type requirement. There is some merit in viewing an ineffectiveness claim as a unitary issue, notwithstanding the number of separate reasons advanced in support of the claim. See *Galloway*, 56 F.3d at 1241. However, our rule governing the sufficiency of a 60-1507 motion appears to require more specificity. Supreme Court Rule 183(e) dictates that "[a] motion to vacate a sentence shall be deemed sufficient if in substantial compliance with the form" set forth by the Judicial Council. 2007 Kan. Ct. R. Annot. 244. In paragraph 10 of that form, movant is directed to "[s]tate concisely all the grounds on which you base your allegation that you are being held in custody unlawfully." In the next paragraph, movant is directed to concisely state the facts which support each of the grounds. That language calls for specificity in the manner in which the movant claims ineffective assistance of counsel. Further, when a movant submits the form, he or she "is presumed to have listed *all* of the grounds upon which he is relying." *Smith v. State*, 195 Kan. 745, 747, 408 P.2d 647 (1965).

Accordingly, the district court was unquestionably correct in finding no relation back for the claims set forth in paragraphs (d), (e), (i), (j), (l), (m), and (p) of the amended motion because they are based on different grounds than asserted in the original motion. The claims set forth in paragraphs (f), (g), and (h) dealt with trial

counsel's effectiveness concerning Dr. Mitchell's testimony, which could arguably be bootstrapped into an originally raised ground for relief. However, any error in that regard was ameliorated when the district court nevertheless ruled on the merits of those claims.

Finally, Pabst argues in the alternative that the district court should have extended the time limitation of K.S.A. 60-1507(f)(1) to prevent manifest injustice, as permitted in K.S.A. 60-1507(f)(2). However, as the district court noted, Pabst failed to explain the delay between the filing of the initial motion on October 15, 2003, and the attempted amendment filed July 15, 2005. Originally, Pabst's attorney had asserted that additional time would be required to fully examine the trial and appellate records in order to identify supplemental grounds for relief. The district court found that those records were available through the office of the Clerk of the District Court of Thomas County during the entire period of the delay, suggesting that no good cause had been shown to extend the limitation period.

Further, we find unavailing Pabst's argument that it was manifestly unjust for him not to have known that the district court would not find K.S.A. 60-215(a) applicable to give him an absolute right to amend his motion. Apparently, original counsel did not believe such an absolute right existed, given that he advised the court that he would seek leave of court to supplement the motion, after reviewing the record. As noted, no leave of court was sought.

The district court did not err in failing to apply K.S.A. 60-1507(f)(2) to extend the limitation period.

*RULING ON BARRED ISSUES*

Finally, Pabst complains that the district court considered and rejected his new claims, after having determined that they were time-barred. Specifically, he asserts that it was error to rule on those claims without an evidentiary hearing and without making specific findings of fact and conclusions of law.

While Pabst argues why he believes his time-barred ineffectiveness claims had legal merit, he does not explain what evidence he was precluded from presenting on those claims. As noted, neither trial counsel nor appellate counsel were called as witnesses at the

evidentiary hearing on the timely claims. Moreover, the presiding judge had personally observed trial counsel's performance; the judge opined on counsel's overall effectiveness in conducting the trial; and the judge found that the evidence against Pabst was overwhelming. Thus, Pabst fails to convince us that he was prejudiced by the district court's alternative ruling on the merits of the time-barred claims.

Similarly, the district court issued a lengthy memorandum decision, in which it made findings of fact and conclusions of law. Pabst did not object to the decision, and we therefore presume that the district court found all facts necessary to support its judgment. See *Gilkey*, 31 Kan. App. 2d at 77-78.

Affirmed.

DAVIS, J., not participating.

MCANANY, J., assigned.