NOT DESIGNATED FOR PUBLICATION

No. 116,116

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

ROGER L. NICHOLS,
*Appellant/Cross-appellee*,

v.

STATE OF KANSAS,
*Appellee/Cross-appellant*.


MEMORANDUM OPINION

Appeal from Leavenworth District Court; GUNNAR A. SUNDBY, judge. Opinion filed August 4, 2017. Affirmed.

*Adam M. Hall*, of Thompson Ramsdell & Warner, P.A., of Lawrence, for appellant/cross-appellee.

*Kristafer R. Ailslieger*, deputy solicitor general, and *Derek Schmidt*, attorney general, for appellee/cross-appellant.


Before GREEN, P.J., POWELL and GARDNER, JJ.


*Per Curiam*:  Roger Nichols appeals from a judgment denying his K.S.A. 60-1507 motion, alleging ineffective assistance of trial counsel. Nichols argues that the district court erred when it failed to rule that his trial counsel had furnished ineffective assistance of counsel that prejudiced his defense. The State has cross-appealed, arguing that the district court erred when it ruled that two of Nichols' claims against his trial counsel related back to his timely filed K.S.A. 60-1507 motion. Yet, as stated below, it was not unreasonable for the district court to rule that Nichols' later claims related back to his

1

timely filed K.S.A. 60-1507 motion. Moreover, for the reasons set forth below, we reject Nichols' ineffective assistance of counsel arguments. As a result, we affirm.

In affirming Nichols' convictions upon his direct appeal in *State v. Nichols*, No. 106,974, 2012 WL 6217199, at *1-2 (Kan. App. 2012) (unpublished opinion), *rev. denied* 297 Kan. 1253 (2013), this court explained the underlying facts of Nichols' case as follows:

"Christina Williams dated Roger Nichols from 2003 to 2008. Williams has two children: M.G., born in 1998, and T.H., born in 2001. M.G. and T.H. called Nichols 'Dad' even though he was not their biological father, and he was often left alone with the two girls. After the breakup, Nichols and Williams remained friends, and Nichols still interacted with M.G. and T.H.

"On May 22, 2010, Williams overheard M.G.'s friend ask her over speakerphone, 'Do you remember what your stepdad did to your sister?' When Williams questioned M.G. about this comment, M.G. told Williams that Nichols had done 'adult things' to both M.G. and T.H. On further questioning by Williams, although the girls couldn't say how many times they were abused, they agreed that it happened '[a] lot,' and when Williams wasn't around. At that point, Williams called the police.

"After police investigation, Nichols was charged with one count of rape, one count of aggravated criminal sodomy, and two counts of aggravated indecent liberties with a child. The jury convicted Nichols of aggravated criminal sodomy of T.H. and of aggravated indecent liberties with both M.G. and T.H. The jury acquitted Nichols of raping M.G.

"At trial, Williams testified that M.G. had been undergoing counseling for depression since early 2010—before Williams was aware of the sexual abuse. Nichols moved for a mistrial because the State had not disclosed that M.G. was in counseling; Nichols claimed that this omission prejudiced his trial rights. If he had been aware of this information, Nichols argued, he would have subpoenaed the counseling records 'because the information in those counseling sessions and any potential denials or recantation that occurred could have been absolutely pivotal to this case.' The State admitted that it was aware of the counseling but never obtained the records because it did not feel they were

necessary. The judge denied Nichols' motion for mistrial, finding no violation of any discovery orders.

"M.G. testified that Nichols touched her chest and inserted his penis and fingers into her vagina on multiple occasions. M.G. also reported that Nichols either urinated or ejaculated on her back and in her mouth:

'[Nichols] said he was going to put lotion on my back. But it didn't feel like lotion. It was all warm and liquidy, and it started running. And— well, it pretty much felt like he was peeing on my back.

. . . .

. . . [Another time, Nichols] told me that he was going to give me some candy, and then there was something in my mouth, and it was gross, and it was warm, and it was all liquidy, and I didn't know what it was 'cause my face was covered up. And then I uncovered my face, and I started spitting it out. And then he said it was probably old candy.'

"M.G. first remembered the abuse occurring in 2006, when she was 7 to 8 years old. According to M.G., this abuse happened 'a lot,' over a long period of time, until she was 11 or 12 years old.

"T.H. testified that Nichols touched her 'bottom' or 'butt' with his fingers on multiple occasions. Sometimes, Nichols' fingers penetrated her anus. When T.H. would scream, Nichols covered her mouth. T.H. did not believe that Nichols ever used his penis or other parts of his body to touch or penetrate her.

"Nichols presented the testimony of several of his family members who claimed that M.G. and T.H. had admitted to lying about the abuse. Both M.G. and T.H. denied making these statements, maintaining that they never told anyone that the abuse hadn't happened. Nichols also testified in his own defense, denying that he ever sexually touched, exposed himself to, urinated on, or ejaculated on either M.G. or T.H.

. . .

"Nichols was sentenced to three hard-25 life sentences under the Jessica's Law statute, K.S.A. 2006 Supp. 21-4643, with two of the counts to run consecutively. Nichols has appealed to this court."

On August 14, 2014, exactly 1 year after our Supreme Court denied Nichols' petition for review, Nichols moved for relief under K.S.A. 60-1507. In his motion,

3

Nichols alleged that his trial counsel, Debra Snider, had provided ineffective assistance of counsel for the following reasons: (1) Snider failed to obtain and preserve "[F]acebook messages sent by M.G. to witnesses [he had] identified"; (2) Snider failed to obtain and use his employment records, which would have "substantiate[d] [his] claim that the opportunity for the crime(s) was not present"; (3) Snider failed to obtain and use the psychological records of M.G.; (4) Snider failed to obtain and use the medical records of M.G. and T.H.; (5) Snider failed "to competently investigate his case"; and (6) Snider failed to "call relevant witnesses in [his] defense."

Later, on June 8, 2015, Nichols moved to amend his K.S.A. 60-1507 motion. In his motion to amend, Nichols alleged that his current counsel had just discovered the existence of records from the Department of Children and Families (DCF), regarding an earlier allegation that M.G. and T.H. had been sexually abused by him. Nichols alleged that the 2006 DCF records showed that M.G. and T.H. had denied that they had been sexually abused by him during this earlier investigation. Nichols asserted that Snider's failure to present this evidence of M.G.'s and T.H.'s previous denial was "clearly prejudicial." The district court allowed Nichols to amend his K.S.A. 60-1507 motion, but the court refused to rule on whether this new argument was properly before it until it considered the merits of his motion. Also, in Nichols' pretrial memorandum filed several months after his motion to amend, Nichols alleged that he would be arguing that Snider was ineffective for failing to call Michelle Byrd, his ex-fiancé, as a witness. Nichols alleged that Byrd was an important witness because she was present when M.G. and T.H. had recanted the alleged abuse in front of his other family members.

The trial court denied Nichols' K.S.A. 60-1507 motion because he had failed to establish Snider's representation fell below the presumption of reasonable performance for each of his claims.

Nichols has timely appealed. Further, the State has timely cross-appealed.

4

*Did the District Court Err by Finding That Nichols' New Arguments Related Back to His Timely Filed K.S.A. 60-1507 Motion Arguments?*

In its cross-appeal, the State argues that the district court abused its discretion by finding that Nichols' arguments about the 2006 DCF records and Byrd's testimony related back to Nichols' original arguments in his timely filed K.S.A. 60-1507 motion. Nichols responds that the arguments were properly before the district court because in his K.S.A. 60-1507 motion, he had broadly alleged that Snider had failed to adequately investigate impeaching evidence and failed to call "relevant witnesses." Nichols further argues that the district court should have found that he was allowed to make his arguments about the DCF records based on a showing of manifest injustice.

*Applicable Law*

Appellate courts review a district court's decision on a motion to amend pleadings under the abuse of discretion standard. *Thompson v. State*, 293 Kan. 704, 709, 270 P.3d 1089 (2011). A district court abuses its discretion when it makes an error of fact, an error of law, or an unreasonable decision. *State v. Marshall*, 303 Kan. 438, 445, 362 P.3d 587 (2015).

*Timing of Nichols' Arguments*

K.S.A. 2016 Supp. 60-1507(f)(1)(A) requires that movants bring their claims within 1 year of "[t]he final order of the last appellate court in this state to exercise jurisdiction on a direct appeal or the termination of such appellate jurisdiction." Our Supreme Court denied Nichols' petition for review from his direct appeal on Friday, August 19, 2013. K.S.A. 2016 Supp. 60-206(a)(1)(A) and (B) requires that for time computation purposes, one must "[e]xclude the day of the event that triggers the period"

but otherwise "count every day, including intermediate Saturdays, Sundays and legal holidays." Accordingly, to timely move for relief under K.S.A. 60-1507, Nichols was required to file his motion no later than August 20, 2014.

Thus, Nichols' original motion filed on August 19, 2014, was timely. Yet, his motion to amend his K.S.A. 60-1507 motion, which was filed on June 8, 2015, was well beyond the K.S.A. 2016 Supp. 60-1507(f)(1)(A) 1-year time limit. Once again, in his motion to amend, Nichols alleged that he should be allowed to argue that Snider was ineffective for failing to present evidence concerning M.G.'s and T.H.'s denials that he had sexually abused them in the earlier DCF investigation in 2006. Moreover, Nichols first argued that Snider should have had Byrd testify in his "trial memorandum" filed on October 26, 2015, well past the 1-year time limit of K.S.A. 2016 Supp. 60-1507(f)(1)(A) and less than a month before his evidentiary hearing.

Moreover, we point out that Nichols never formally moved to amend his K.S.A. 60-1507 motion to include his arguments concerning Byrd's testimony. Furthermore, it is also important to point out that although the State had argued to the district court that Nichols' arguments concerning the 2006 DCF records and Byrd's testimony did not relate back to his arguments within his timely filed K.S.A. 60-1507 motion, Nichols never made such an argument. Instead, Nichols argued that his arguments were properly before the court based on manifest injustice and the State's failure to timely object to his new arguments. As a result, even though Nichols never asserted that his new arguments related back, the trial court found that Nichols' new arguments related back. Accordingly, this is a situation where the K.S.A. 60-1507 movant did not make the relation-back argument he now espouses on appeal and where the court essentially sua sponte created and adopted an argument for the movant.

Clearly, this was not the best practice on either Nichols' or the district court's part. All the same, the State has not complained about Nichols' failure to raise the relation-

6

back argument below or the district court's sua sponte creation and adoption of this argument. Moreover, in *Pabst v. State*, 287 Kan. 1, 25, 192 P.3d 630 (2008), our Supreme Court reached the merits of Pabst's relation-back argument even though "Pabst neither sought nor obtained leave of court to amend his motion" and the district court raised the relation-back argument on its own. 287 Kan. at 25. Based on our Supreme Court's actions of reaching the merits of Pabst's arguments, we will consider whether Nichols' arguments about the 2006 DCF records and Byrd's testimony related back to his timely filed K.S.A. 60-1507 motion.

### *Nichols' New Arguments Related Back*

Turning our focus next to the rules regarding relation back, once the K.S.A. 2016 Supp. 60-1507(f)(1)(A) 1-year time limit has passed, we note that movants who timely filed their K.S.A. 60-1507 motion may amend those motions to add new arguments so long as those amendments relate back to the arguments in their timely filed K.S.A. 60-1507 motion. See *Pabst*, 287 Kan. at 25. K.S.A. 2016 Supp. 60-215(c)(2) states: "An amendment to a pleading relates back to the date of the original pleading when: the amendment asserts a claim or defense that arose out of the conduct, transaction or occurrence set out, or attempted to be set out, in the original pleading." In *Pabst*, our Supreme Court held that an amended motion relates back if its arguments are of the same time and type as the arguments raised in the original timely filed motion. 287 Kan. 1, Syl. ¶ 7. In *Mayle v. Felix*, 545 U.S. 644, 125 S. Ct. 2562, 162 L. Ed. 2d 582 (2005), a case the *Pabst* court relied on, the United States Supreme Court held that an amended motion relates back to the original timely filed motion when the arguments within both motions hinge on the same common core of operative facts. 545 U.S. at 657.

In this case, the State asserts that Nichols' arguments about the 2006 DCF records and Byrd's testimony did not relate back to the arguments in Nichols' timely filed K.S.A. 60-1507 motion because nothing "related" to the 2006 DCF records or Byrd's testimony

7

was contained within Nichols' timely filed K.S.A. 60-1507 motion. It is unclear what the State means by its use of the term "related." Certainly, Nichols did not explicitly reference the 2006 DCF records or Byrd's testimony in his timely filed K.S.A. 60-1507 motion. If this is the relation-back standard the State desires to hold Nichols to, then the State has held Nichols to a higher relation-back standard than Kansas law requires.

Here, the strength of relationship between the arguments raised in Nichols' timely filed K.S.A. 60-1507 motion and later arguments are not all that different than those at issue in *Shumway v. State*, 48 Kan. App. 2d 490, 504, 293 P.3d 772 (2013). In *Shumway*, this court held that because Shumway had timely filed his K.S.A. 60-1507 motion, arguing that his trial attorney was ineffective for not calling certain alibi witnesses, his later arguments that his attorney was ineffective for failing to call other witnesses that would have supported his theory of his defense related back to his earlier arguments about the alibi witnesses. The *Shumway* court concluded that "the amended motion and the original motion are related to the same general conduct, transaction, and occurrence which involved Shumway's claim of ineffective assistance of trial counsel." 48 Kan. App. 2d at 504-05.

Here, in his timely filed K.S.A. 60-1507 motion, Nichols argued that Snider was ineffective for failing to use psychological and medical records that he believed would have established that M.G. and T.H. were lying about the sexual abuse. Plainly, Nichols' later argument about Snider's failure to use the 2006 DCF records to show that M.G. and T.H. had previously denied that he had sexually abused them was of the same general nature as his earlier arguments concerning medical and psychological records. Also, Nichols argued in his timely filed K.S.A. 60-1507 motion that Snider was ineffective for failing to call a specific witness whose testimony would have supported that M.G. and T.H. had lied about the sexual abuse. By reviewing Nichols' new argument concerning Byrd's testimony, it is readily apparent that this new argument is nearly identical to the preceding timely raised argument because both arguments claim that Snider was

8

ineffective for not calling a witness who could testify that M.G. and T.H. had lied about the sexual abuse.

In summary, because Nichols' later arguments concerning the 2006 DCF records and Byrd's testimony were of the same time and type of evidence and general conduct at issue in his timely filed K.S.A. 60-1507 motion, it was not an abuse of discretion for the district court to find that these arguments related back. Thus, the district court properly determined that Nichols' later arguments related back to his timely filed K.S.A. 60-1507 motion.

*Did the District Court Err by Denying Nichols' K.S.A. 60-1507 Motion?*

Nichols argues that the district court erred when it failed to rule that Snider had provided ineffective assistance of counsel that prejudiced his defense. Nichols raises six arguments why he believes Snider was ineffective to a level that prejudiced his defense: (1) Snider failed to admit into evidence the Facebook message between M.G. and I.N.; (2) Snider failed to subpoena and admit into evidence his employment records; (3) Snider failed to subpoena and admit into evidence M.G.'s psychological records; (4) Snider failed to subpoena and admit into evidence M.G.'s and T.H.'s medical records; (5) Snider failed to admit into evidence the 2006 DCF records detailing M.G.'s and T.H.'s denial that he sexually abused them then; and (6) Snider failed to present the testimony of Byrd. The State responds by arguing that Nichols cannot establish that Snider's decisions were objectively unreasonable, often emphasizing that Nichols has ignored that Snider had strategic reasons for her decisions. Alternatively, the State contends that Nichols cannot establish that Snider's representation resulted in prejudice.

9

*Applicable Law*

Appellate courts use a two-step standard of review when considering the district court's decision on claims of ineffective assistance of counsel following a full evidentiary hearing. First, appellate courts review the district court's factual findings to determine whether the findings are supported by substantial competent evidence. *Fuller v. State*, 303 Kan. 478, 485, 363 P.3d 373 (2015). Then, appellate courts review the district court's legal conclusions de novo. 303 Kan. at 485.

To establish ineffective assistance of counsel, defendants must comply with the two-prong ineffective assistance of counsel test. Under the first prong, defendants must establish that their counsel's representation was deficient when viewed under the totality of the circumstances. *Sola-Morales v. State*, 300 Kan. 875, 882, 335 P.3d 1162 (2014). Under the second prong, defendants must establish that their counsel's deficient representation prejudiced their defense. 300 Kan. at 882. The test for prejudice is whether the defendant has established that there is a reasonable probability the jury's verdict would have been different but for counsel's deficient performance. 300 Kan. at 882.

When considering counsel's performance, there is a strong presumption that counsel's conduct was within the wide range of reasonable professional assistance. *State v. Kelly*, 298 Kan. 965, 970, 318 P.3d 987 (2014). Accordingly, a court's review of counsel's conduct is highly deferential. 298 Kan. at 970. Moreover, if the decision the defendant complains about was actually a strategic decision made by counsel following a thorough investigation of the law and facts of the defendant's case, then counsel's strategic decision is virtually unchallengeable. *State v. Cheatham*, 296 Kan. 417, 437, 292 P.3d 318 (2013) (citing *Strickland v. Washington*, 466 U.S. 668, 690-91, 104 S. Ct. 2052, 80 L. Ed. 2d 674, *reh. denied* 467 U.S. 1267 [1984]).

*Facebook Message*

Nichols' first argument is that Snider prejudiced his defense by failing to admit into evidence the Facebook message between M.G. and I.N. That message is as follows:

"5:07p.m. [M.G.]: hello
5:07 p.m. [I.N.]: wat you doin
5:07p.m. [M.G.]: istenin 2 music u?
5:08p.m. [I.N.]: nothing I got to talk to dad today he is so sad it makes me sad
5:08p.m. [M.G.]: kool
5:08p.m. [I.N.]: no not kool sad he crys alot
5:08p.m. [M.G.]: y
5:11p.m. [I.N.]: cuz I don't know why he is in jail and he cant see us
5:11p.m. [M.G.]: oh
5:12p.m. [I.N.]: i don't know why all this happen
5:13p.m. [M.G.]: me either
5:13p.m. [I.N.]: do you know about it
5:14p.m. [M.G.]: no
5:15p.m. [I.N.]: dad said some one lied about your mom and you
5:15p.m. [M.G.]: oh
5:16p.m. [I.N.]: did some thang happen
5:16p.m. [M.G.]: no
5:16p.m. [I.N.]: i don't know then
5:17p.m. [M.G.]: k"

In making his argument, Nichols recounts how Snider had attempted to get some documents concerning M.G.'s Facebook page into evidence to discredit M.G., but the trial court sustained the State's objection to the admission of all but one of these documents. Nichols asserts that even though the trial court would not allow Snider to admit the other Facebook documents into evidence, Snider should have attempted to admit the Facebook message between M.G. and I.N. because the message "would have *both* harmed the credibility of a key witness and substantively demonstrated that the

11

alleged molestation did not take place." Nichols alleges that in the Facebook message, M.G. recanted the alleged sexual abuse to I.N. Nichols asserts that it is obvious that Snider should have admitted the Facebook message into evidence because his children—I.N., X.N., and R.N.—testified about M.G.'s recantation to I.N. in the Facebook message at his trial, meaning the actual Facebook message would have corroborated their testimony. Nevertheless, there are significant problems with Nichols' arguments.

To begin with, as emphasized by the State in its brief, M.G. did not recant the alleged sexual abuse in the Facebook message. Instead, I.N. told M.G. that dad—Nichols—had said that somebody had lied about her and her mother—Williams. Then, I.N. immediately asked M.G. if something had happened, to which M.G. stated, "No." The question about whether something had happened was directly related to I.N.'s previous statement that Nichols had said that somebody had lied about M.G. and Williams. There is no evidence concerning what these alleged lies were about. Most importantly, any lies about M.G. and Williams in no way speaks to whether Nichols sexually abused M.G. or T.H. In respect to M.G.'s statement that she did not know why Nichols was in jail, M.G. had testified at trial that she was unaware that there was anything wrong with what Nichols had been doing to her and T.H.; thus, there is evidence that M.G. did not understand that the discovery of the sexual abuse could have legal consequences for Nichols.

Further, M.G.'s responses certainly cannot be described as a recantation. All the Facebook message shows is that when I.N. asked M.G. broad and indefinite questions, M.G.'s response was "no." Thus, when asserting that M.G. had recanted the alleged sexual abuse in the Facebook message, Nichols has mischaracterized the Facebook message. Moreover, Nichols' children were able to testify that M.G. had recanted the alleged sexual abuse to I.N. in a Facebook message.

12

As a result, Nichols cannot establish that Snider's representation was deficient because I.N.'s, X.N.'s, and R.N.'s testimony about the Facebook message came into evidence. That is, I.N., X.N., and R.N. all testified about M.G. admitting that she had lied about the sexual abuse allegations in a Facebook message. Accordingly, there was evidence presented at trial that M.G. had recanted her sexual abuse allegations against Nichols in a Facebook message. This court has previously held that counsel's performance cannot be deficient when the complained-about action would have merely resulted in the presentation of cumulative evidence. *Lewis v. State*, 33 Kan. App. 2d 634, Syl. ¶ 7, 111 P.3d 636 (2003). Here, because Nichols' children had testified about the content of the Facebook message, the admission of the actual Facebook message into evidence would have been cumulative in nature.

*Employment Records*

Second, Nichols argues that Snider provided ineffective assistance of counsel that prejudiced his defense by failing to subpoena his employment records. Nichols argues that his employment records would have shown that he worked long hours, meaning he lacked any opportunity to commit the crimes against M.G. and T.H. Nichols recognizes that he testified about his long work hours at trial. Nevertheless, he asserts that his testimony, by itself, was self-serving; therefore, the fact that Snider failed to subpoena his employment records and admit those records into evidence at his trial prejudiced his defense.

The State counters that Snider's decision not to use Nichols' employment records at trial was a strategic decision made by Snider that Nichols cannot successfully attack. To review, at the K.S.A. 60-1507 evidentiary hearing, Snider testified that she did not seek out Nichols' employment records as a strategic decision. Snider explained that she thought using Nichols' employment records to establish lack of opportunity to commit the crimes against M.G. and T.H. would actually hurt Nichols' case. This was because

13

Nichols had been charged with committing the crimes against M.G. and T.H. sometime between May 1, 2006, and March 31, 2010, a nearly 4-year period during which he lived with M.G. and T.H. most of the time. Thus, according to Snider, it seemed unlikely that the jury would have believed that Nichols had no opportunity to commit the crimes at some point during that 4-year period.

To be sure, Snider's evaluation of the probative value of Nichols' employment records was reasonable. Given that Nichols lived with M.G. and T.H. for most of the 4-year period in question, it is highly inconceivable that Nichols would have had no opportunities to commit the alleged crimes of sexual abuse against M.G. and T.H. because of his long work hours. How long does it take someone to sexually abuse a child? As stressed by the State, the employment records showing that Nichols worked long hours would not have shown that there was no possibility that Nichols could not have committed the crimes against M.G. and T.H.

Because Snider's decision not to use Nichols' employment records was a reasonable strategic decision, Nichols cannot successfully challenge Snider's decision. See *Cheatham*, 296 Kan. at 437.

*Psychological Records*

Third, Nichols argues that Snider provided ineffective assistance of counsel that prejudiced his defense by failing to subpoena and use M.G.'s psychological records at his trial. Nichols recounts how at his trial, Snider learned that M.G. had been going to counseling since early 2010, which resulted in Snider moving for a mistrial. Nichols concludes that an effective attorney would have uncovered that M.G. was in counseling before trial and then used those records at trial.

14

The State responds that Snider was not ineffective because she "had no reason to believe there were psychological or counseling records to investigate and it was not unreasonable for [Snider] to fail to investigate a subject matter for which she had no notice to explore." Snider's testimony at Nichols' K.S.A. 60-1507 evidentiary hearing is consistent with the State's argument as Snider testified that Nichols' family had provided her with so much information she thought she knew about everything. Snider also testified that she was surprised M.G. was in counseling given that M.G.'s family often moved and had very little money.

When considering the extent of counsel's investigation, our Supreme Court has emphasized whether the K.S.A. 60-1507 movant can establish that the evidence would have been discovered if counsel investigated more thoroughly. *Flynn v. State*, 281 Kan. 1154, 1163, 136 P.3d 909 (2006). In his brief, Nichols asserts that if "she [had not] waived [his] preliminary hearing and [had] her private investigator uncover the matter," the fact that M.G. was in counseling would have been discovered. Yet, in making this argument, Nichols ignores that he was the person who waived his preliminary hearing, not Snider. At his preliminary hearing, Nichols was present and stated that he understood he was waiving his right to a preliminary hearing. Also, despite Nichols' arguments within his brief that Snider waived his preliminary hearing without first asking his permission, as recently as his K.S.A. 60-1507 evidentiary hearing, Nichols testified that he "agreed" to waive his preliminary hearing after discussing the matter with Snider.

In making his argument, Nichols further fails to explain how Snider was supposed to get her private investigator to discover that M.G. was in counseling. His failure to do this means that he has not met his burden of establishing that Snider would have discovered that M.G. was in counseling had she investigated his case more thoroughly as described by our Supreme Court in *Flynn*. See *Superior Boiler Works, Inc. v. Kimball*, 292 Kan. 885, 889, 259 P.3d 676 (2011) (holding an issue not briefed by an appellant is deemed waived or abandoned.)

15

For the sake of argument, Nichols contends that the failure to use M.G.'s psychological records prejudiced his defense because part of his defense was that neither M.G. nor T.H. had received any counseling, which supported his contention that they had not been sexually abused. Nichols believes that by having the psychological records of M.G., which did not contain any information regarding treatment for sexual abuse, he could have at least presented evidence to the jury that M.G. was not in counseling because of any sexual abuse. Nichols also believes that because M.G.'s counseling records did not indicate that she had received treatment for sexual abuse, he could have used this information to support his contention that the sexual abuse never occurred. This is a non sequitur, which means it does not follow. It is the fallacy of assuming an unproved cause. In other words, M.G. had not been abused sexually, for her counseling records did not indicate that she had been treated for sexual abuse. There is no connection between the claim and the evidence.

The only document Nichols admitted into evidence relating to M.G.'s counseling is her intake examination. Clearly, the absence of sexual abuse on the intake examination does not necessarily mean that M.G. never received sexual abuse counseling. Indeed, at his K.S.A. 60-1507 evidentiary hearing, M.G.'s counselor stated that the sexual abuse had been discussed at some point during their counseling sessions.

*Medical Records*

Fourth, Nichols argues that Snider provided ineffective assistance of counsel that prejudiced his defense by failing to subpoena and use the medical records of M.G. and T.H. to prove that he did not commit the crimes. Nichols recognizes that Snider testified that she did not subpoena the medical records because the DCF records indicated that M.G., who was then age 8, and T.H., who was then age 5, had "sticky, nasty" vaginal discharge, which made her believe that any medical records would only support that he

16

committed the crimes. Nevertheless, Nichols asserts that Snider's strategy of not subpoenaing the medical records fell below an objective standard of reasonableness. To support this assertion, Nichols cites *Hooper v. Mullin*, 314 F.3d 1162 (10th Cir. 2002).

In *Hooper*, during the penalty stage of Hooper's death penalty case, Hooper's attorney's strategy was to argue that Hooper had brain damage that resulted in violent tendencies. Yet, Hooper's attorney never had Hooper medically evaluated because he feared the results of the medical evaluation would be more harmful than helpful, *i.e.*, a medical evaluation would reveal that Hooper did not actually have brain damage. The *Hooper* court held that this constituted deficient performance because strategic decisions not to investigate a matter cannot be deemed reasonable if those decisions were uniformed. 314 F.3d at 1171.

The State responds to Nichols' reliance on *Hooper* by contending that the *Hooper* case is distinguishable from Nichols' case. The State's contention is certainly correct as the *Hooper* case is very different from Nichols' case because unlike Snider, Hooper's attorney actually presented a medical related defense; Hooper's attorney argued that Hooper had brain damage even though the attorney never requested that Hooper undergo medical evaluations. See *Hooper*, 314 F.3d at 1170. Here, Snider did not request M.G.'s or T.H.'s medical records because whether the sexual abuse was supported by the medical records was not part of the defense she created for Nichols.

Also, Nichols' case is different than the *Hooper* case because Snider's decision not to pursue the medical records of M.G. and T.H. was a strategic decision made after a thorough investigation of the facts of Nichols' case. Once more, Snider testified about finding it suspicious that the DCF records stated that M.G. and T.H. had "sticky, nasty" vaginal discharge. At Nichols' K.S.A. 60-1507 evidentiary hearing, the fact M.G. and T.H. had concerning vaginal discharge was confirmed by the 2006 DCF records and the testimony of Ruth Meyer-Bareiss, who was the DCF caseworker assigned to M.G.'s and

17

T.H.'s case in 2006. Very clearly, the "sticky, nasty" vaginal discharge in M.G.'s and T.H.'s 2006 DCF records provided Snider with a reason not to pursue M.G.'s and T.H.'s medical records; the fact that the 8-year-old and 5-year-old girls were suffering from such vaginal discharge was a red flag that the girls might have been sexually abused. Snider also testified that she made a strategic decision not to pursue the medical records because she learned from the State that it would not be presenting medical evidence. Thus, Snider explained that she believed that it was very risky to subpoena the medical records given that there was a strong possibility that doing so would have provided the State with damning evidence it would not have otherwise known about. In turn, bcause Snider's decision not to pursue and use M.G.'s and T.H.'s medical records was a strategic decision made after a thorough investigation of the facts of Nichols' case, her actions cannot be deemed deficient. See *Cheatham*, 296 Kan. at 437.

*2006 DCF Records*

Fifth, Nichols argues that Snider provided ineffective assistance of counsel that prejudiced his defense by failing to use the 2006 DCF records. Nichols argues that since M.G. and T.H. denied that he had sexually abused them in the 2006 DCF investigation, the admission of the 2006 DCF records reporting M.G.'s and T.H.'s denials would have supported his theory of defense that M.G. and T.H. were lying about their current allegations of sexual abuse against him. Nichols also emphasizes that he was charged with committing his crimes between May 1, 2006, and March 31, 2010, meaning the timing of the 2006 DCF investigation, which took place between August and October 2006, overlapped with the timing of his charges. Based on the preceding, Nichols contends that the 2006 DCF records would help prove that he did not sexually abuse M.G. or T.H. during that time. Last, Nichols argues that the evidence of an earlier sexual abuse investigation would have undermined Williams' testimony at his trial that she was "blindsided" by the sexual abuse allegations at hand.

18

The State responds by conceding that at Nichols' K.S.A. 60-1507 hearing, Snider could not specifically recall why she did not use the 2006 DCF records at trial. All the same, the State asserts that Snider's failure to recall why she did not use the 2006 DCF records does not mean that Snider's representation fell below an objective standard of reasonableness. Indeed, although Snider stated that she could not recall why she did not use the 2006 DCF records, immediately after making this statement she explained how she did not pursue M.G.'s and T.H.'s medical records because some of the DCF records she had received said that M.G. and T.H. had "sticky, nasty" vaginal discharge. While it seems Snider might not have realized this when she testified, the DCF records that refer to M.G.'s and T.H.'s vaginal discharge were the 2006 DCF records. Thus, even though Snider could not specifically recall why she did not use the 2006 DCF records at trial, she did provide testimony speaking to the damaging nature of the 2006 DCF records.

*Byrd's Testimony*

Sixth, Nichols argues that Snider provided ineffective assistance of counsel that prejudiced his defense by failing to call Byrd as a witness. Nichols argues that M.G. and T.H. had told Byrd that they had lied about the sexual abuse while at a pool. Nichols argues that Byrd's testimony was important because the other witnesses who testified they heard M.G. and T.H. recant at the pool were members of his family. Nichols asserts Byrd's testimony, as an "outsider," would have brought credibility to the other testimony supporting that M.G. and T.H. recanted at the pool. Nichols admits that Snider testified that he had agreed Byrd should not testify at his trial, but he asserts that this court should find his testimony more credible than Snider's testimony. Yet, like his prior arguments there are several problems with Nichols' arguments.

To begin with, Nichols has requested that this court reweigh the district court's credibility determination that Snider was telling the truth regarding her and Nichols' agreement that Byrd should not testify. Yet, so long as the district court's credibility

19

determination was not wholly unreasonable, this court is not in a position to reweigh the district court's credibility determinations. See *State v. Daws*, 303 Kan. 785, 789, 368 P.3d 1074 (2016). Here, Nichols asserts that his testimony was more credible than Snider's testimony because Snider's testimony was self-serving. Yet, Nichols fails to recognize that his testimony that he never agreed with Snider that Byrd should not testify is also self-serving; he has made this assertion while attempting to get a new trial based on ineffective assistance of counsel. In addition, Byrd's testimony at Nichols' evidentiary hearing confirmed Snider's version of events because Byrd testified that during Nichols' trial, Snider had told her that she would not be testifying because she had "past charges." Most importantly, because Snider testified that she and Nichols agreed about not having Byrd testify, it cannot be said that the district court's credibility determination was unreasonable. Therefore, we must accept the district court's credibility determination.

Next, as emphasized by the State, Snider provided valid reasons for not having Byrd testify. Snider testified that she did not want to have Byrd testify because (1) Byrd was very emotional during her interviews, making her believe she would be a bad witness and (2) Byrd had committed crimes of dishonesty in her past. Byrd, who testified at Nichols' K.S.A. 60-1507 evidentiary hearing, confirmed that she had been convicted of crimes of dishonesty. Thus, as asserted by Snider while testifying, had Byrd testified about M.G. and T.H. recanting, the State could have attacked Byrd's credibility based on her past crimes. In consequence, there was a strong possibility that the testimony of Nichols' family members about hearing M.G. and T.H. recant could also be undermined. In short, because Snider's decision not to have Byrd testify was a strategic decision made after a thorough examination of the facts at issue in Nichols' case, Snider was not ineffective for failing to call Byrd. See *Cheatham*, 296 Kan. at 437.

Last, as with Nichols' argument about the Facebook message, Nichols could never establish that Snider's representation was deficient or that he suffered prejudice based on her failure to have Byrd testify because any testimony Byrd would have given would

20

have been cumulative. At his trial, Nichols' mother and ex-wife, who he evidently still considers family, both testified that M.G. and T.H. had told them that they had lied about the sexual abuse while they were all at the pool. Thus, Byrd's testimony would have just repeated Nichols' mother's and ex-wife's testimony. Because an attorney's representation cannot be deemed ineffective and prejudice cannot exist when the evidence in question would have been cumulative, it is readily apparent that prejudice cannot exist in Nichols' case. See *Lewis*, 33 Kan. App. 2d 634, Syl. ¶ 7.

Notwithstanding the preceding, Nichols' argument that Byrd would have provided credibility to the allegation that M.G. and T.H. had recanted at the pool because unlike the other people who testified, Byrd was not a member of his family, is meritless. When the trial occurred, Byrd was Nichols' fiancée and they had a child together. As a result, it is mischaracterization to portray Byrd as a disinterested witness whose testimony would have been seen by the jury as more credible.

*Conclusion*

In conclusion, each of Nichols' arguments regarding why Snider provided ineffective assistance of counsel fails because he has not proven that Snider's representation fell below an objective standard of reasonableness. Moreover, even if Nichols had established that Snider had provided ineffective assistance of counsel, the district court's decision to deny his K.S.A. 60-1507 motion was still proper because he has failed to establish prejudice.

Affirmed.